Certiorari granted by Supreme Court, January 25, 2021
Remanded and vacated by Supreme Court, January 25, 2021

## ON REHEARING EN BANC

## PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

### No. 18-2486

In re: DONALD J. TRUMP, President of the United States of America, in his official capacity and in his individual capacity,

Petitioner.

---------------------------------------------------------------

PROFESSOR CLARK D. CUNNINGHAM; PROFESSOR JESSE EGBERT,

Amici Curiae,

SCHOLAR SETH BARRETT TILLMAN; JUDICIAL EDUCATION PROJECT,

Amici Supporting Petitioner,

FORMER NATIONAL SECURITY OFFICIALS; COMMONWEALTH OF VIRGINIA; THE NISKANEN CENTER; REPUBLICAN WOMEN FOR PROGRESS; CHERI JACOBUS; TOM COLEMAN; EMIL H. FRANKEL; JOEL SEARBY; ADMINISTRATIVE LAW, CONSTITUTIONAL LAW, AND FEDERAL COURTS SCHOLARS; CERTAIN LEGAL HISTORIANS,

Amici Supporting Respondents.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Peter J. Messitte, Senior District Judge. (8:17-cv-01596-PJM)

Argued: December 12, 2019          Decided: May 14, 2020

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, KING, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, HARRIS, RICHARDSON, QUATTLEBAUM, and RUSHING, Circuit Judges.

---

Petition for writ of mandamus denied by published opinion. Judge Motz wrote the majority opinion, in which Chief Judge Gregory and Judges King, Keenan, Wynn, Diaz, Floyd, Thacker, and Harris joined. Judge Wynn wrote a concurring opinion, in which Judges Keenan, Floyd, and Thacker joined. Judge Wilkinson wrote a dissenting opinion, in which Judges Niemeyer, Agee, Richardson, Quattlebaum, and Rushing joined. Judge Niemeyer wrote a dissenting opinion, in which Judges Wilkinson, Agee, Quattlebaum, and Rushing joined.

---

**ARGUED:** Hashim M. Mooppan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Petitioner. Loren Linn AliKhan, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C., for Respondents. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Mark R. Freeman, Michael S. Raab, Martin Totaro, Joshua Revesz, Megan Barbero, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Petitioner. Brian E. Frosh, Attorney General, Steven M. Sullivan, Solicitor General, Leah J. Tulin, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; Karl A. Racine, Attorney General, Stephanie E. Litos, Assistant Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C.; Norman Eisen, Noah Bookbinder, Laura C. Beckerman, Stuart C. McPhail, CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, Washington, D.C.; Deepak Gupta, Joshua Matz, Daniel Townsend, GUPTA WESSLER PLLC, Washington, D.C.; Joseph M. Sellers, Christine E. Webber, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C., for Respondents. Craig Thomas Merritt, CHRISTIAN & BARTON, L.L.P., Richmond, Virginia, for Amici Professor Clark D. Cunningham and Professor Jesse Egbert. Carrie Severino, JUDICIAL EDUCATION PROJECT, Washington, D.C., for Amicus Judicial Education Project. Robert W. Ray, THOMPSON & KNIGHT LLP, New York, New York; Josh Blackman, Houston, Texas, for Amicus Seth Barrett Tillman. Jan I. Berlage, GOHN HANKEY & BERLAGE LLP, Baltimore, Maryland, for Amici Judicial Education Project and Seth Barrett Tillman. Harold Hongju Koh, Rule of Law School, YALE LAW SCHOOL, New Haven, Connecticut; Phillip Spector, MESSING & SPECTOR LLP, Baltimore, Maryland, for Amici Former National Security Officials. Mark R. Herring, Attorney General, Toby J. Heytens, Solicitor General, Matthew R. McGuire, Principal Deputy Solicitor General, Michelle S. Kallen, Deputy Solicitor General, Brittany M. Jones, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. Colin E. Wrabley, Devin M. Misour, Brian T. Phelps, Pittsburgh, Pennsylvania, M. Patrick Yingling, REED SMITH LLP, Chicago, Illinois, for

2

Amici The Niskanen Center, Republican Women for Progress, Cheri Jacobus, Tom Coleman, Emil H. Frankel, and Joel Searby.  Regina Kline, Jean M. Zachariasiewicz, Anthony J. May, BROWN, GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for Amici Administrative Law, Constitutional Law, and Federal Courts Scholars.  H. Laddie Montague, Jr., Eric J. Cramer, Candace J. Enders, BERGER & MONTAGUE, P.C., Philadelphia, Pennsylvania; Erica C. Lai, Melissa H. Maxman, COHEN & GRESSER LLP, Washington, D.C., for Amici Certain Legal Historians.

---

3

DIANA GRIBBON MOTZ, Circuit Judge:

President Donald J. Trump, in his official capacity, petitions this court for a writ of mandamus directing the district court to certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) or, in the alternative, ordering the district court to dismiss the complaint against him.  The President maintains that the district court committed multiple errors that we should correct; however, this case is not on appeal.  We recognize that the President is no ordinary petitioner, and we accord him great deference as the head of the Executive branch.  But Congress and the Supreme Court have severely limited our ability to grant the extraordinary relief the President seeks.  Because the President has not established a right to a writ of mandamus, we deny his petition.

I.

The District of Columbia and the State of Maryland ("Respondents") filed this action in the District of Maryland against the President in his official capacity.[1]  They allege that the President is violating the Foreign and Domestic Emoluments Clauses of the U.S. Constitution by accepting prohibited "emoluments" from foreign and domestic governments.  The Foreign Emoluments Clause provides:

> No Title of Nobility shall be granted by the United States:  And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

---

[1] Respondents later amended their complaint to add the President in his individual capacity.  The President noted an interlocutory appeal in that case, No. 18-2488, which we address in a companion opinion, also issued today.  References to the President in this opinion refer to the President in his official capacity.

4

U.S. Const. art. I, § 9, cl. 8.  The Domestic Emoluments Clause provides:

> The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

*Id.* art. II, § 1, cl. 7.

The President moved to dismiss the complaint.  After considering the parties' extensive oral arguments and lengthy briefs, the district court issued two thorough opinions.  *See District of Columbia v. Trump*, 315 F. Supp. 3d 875 (D. Md. 2018); *District of Columbia v. Trump*, 291 F. Supp. 3d 725 (D. Md. 2018).  The court granted the President's motion to dismiss with respect to the operations of the Trump Organization outside the District of Columbia, concluding that Respondents lacked standing to pursue those claims.  *Trump*, 291 F. Supp. 3d at 732.  This narrowed the case to the President's alleged violations relating to the Trump International Hotel in Washington, D.C.  The district court denied the motion with respect to that hotel.

The President moved for certification to take an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), seeking appellate review of four questions:  (1) the correct interpretation of the term "emolument"; (2) whether Respondents had an equitable cause of action to bring the suit; (3) whether Respondents had Article III standing; and (4) whether any court has the ability to issue equitable relief against the President in these circumstances.  The district court declined to certify an interlocutory appeal, explaining its decision in another written opinion.  There, the court recognized the proper standard for certification under § 1292(b) and elaborated why, in its opinion, resolution of the questions

presented by the President did not satisfy the statutory prerequisites. *See District of Columbia v. Trump*, 344 F. Supp. 3d 828, 844 (D. Md. 2018).

In response, the President petitioned this court for a writ of mandamus, invoking the All Writs Act, 28 U.S.C. § 1651(a), and Federal Rule of Appellate Procedure 21. He asks us either to direct the district court to certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) or to order the district court to dismiss the complaint with prejudice. A panel of this court granted the President's petition for a writ of mandamus and, purportedly exercising jurisdiction pursuant to § 1292(b), found Respondents lacked standing and so "reverse[d] the district court's orders" and "remand[ed] with instructions to dismiss the complaint with prejudice." *In re Trump*, 928 F.3d 360, 364 (4th. Cir. 2019). We subsequently agreed to hear the case en banc, vacating the panel opinion. *In re Trump*, 780 F. App'x 36 (4th Cir. 2019).

## II.

A writ of mandamus is not a means to prevent "hardship occasioned by appeal being delayed until after final judgment." *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953) (internal quotation marks omitted). Rather, it is a "drastic" remedy that is appropriate "only in extraordinary situations," such as where a court has exceeded the "lawful exercise of its prescribed jurisdiction" or refused "to exercise its authority when it is its duty to do so." *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 402 (1976) (internal quotation marks omitted). As the Supreme Court has explained, issuance of the writ without adherence to these strictures would erode the final judgment rule, a congressional

6

command since the Judiciary Act of 1789. *Id.* at 403; *accord Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980).

Accordingly, a petitioner seeking mandamus relief bears the burden of demonstrating that he has satisfied three requirements. *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380 (2004). First, the petitioner must establish that there are no other adequate means of obtaining the relief sought. This criterion is "designed to ensure that the writ will not be used as a substitute for the regular appeals process." *Id.* at 380–81. If there is an available "alternative, less extreme, path to [relief,] issuance of the writ is inappropriate." *Kerr*, 426 U.S. at 396.

Second, the petitioner must prove that his "right to issuance of the writ is clear and indisputable." *Cheney*, 542 U.S. at 381 (internal quotation marks omitted). This criterion similarly ensures that the writ of mandamus is not "made to serve the purpose of an ordinary suit. It will issue only where the duty to be performed is ministerial and the obligation to act peremptory and plainly defined. The law must not only authorize the demanded action but require it; the duty must be clear and indisputable." *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931).

Third, even if the petitioner satisfies the first two criteria, "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381. Thus, the decision to issue a writ of mandamus "is in large part a matter of discretion with the court to which the petition is addressed." *Kerr*, 426 U.S. at 403.

Given the demanding criteria a petitioner must meet to obtain a writ of mandamus, appellate courts rarely grant mandamus relief, and even more rarely find it appropriate to issue a writ of mandamus to correct acts within the discretion of the district court. *See, e.g.*, *In re Ralston Purina Co.*, 726 F.2d 1002, 1005 (4th Cir. 1984) ("[W]hile writs of mandamus to review discretionary decisions of district judges are not proscribed, they should 'hardly ever' issue." (quoting *Allied Chem.*, 449 U.S. at 36)).

Of course, when the petitioner is the President, "the Court of Appeals must also ask, as part of this [mandamus] inquiry, whether the District Court's actions constituted an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney*, 542 U.S. at 390. The special solicitude for a President seeking a writ of mandamus "give[s] recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties." *Id.* at 382.

The President advances two courses that he maintains provide him entitlement to the extraordinary relief he seeks. We address each in turn and then consider the contention that, in any event, *Cheney* requires us to grant such relief.

## III.

First and principally, the President contends that this court should issue a writ of mandamus ordering the district court to certify its orders for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). That statute provides a vehicle for appeal of an interlocutory order

8

where the district court and the court of appeals have agreed that such an appeal is appropriate.

Section 1292(b) mandates that a litigant who wishes to take such an interlocutory appeal first seek certification from the district court, and, only after the district court agrees, obtain permission from the court of appeals:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be *of the opinion* that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action *may* thereupon, *in its discretion*, permit an appeal to be taken from such order . . . .

28 U.S.C. § 1292(b) (emphases added). Thus, the plain language of the statute establishes that Congress vested the district court and the court of appeals each with discretion in making its respective decision.

The legislative history of § 1292(b) confirms Congress's clear intent to require both the district court and the court of appeals to agree to allow an interlocutory appeal and to provide both courts with discretion in deciding whether to do so. *See, e.g.*, S. Rep. No. 2434, 85th Cong., 2d Sess. 3 (1958) ("[T]he bill is cast in such a way that the appeal is discretionary rather than a matter of right. It is discretionary in the first instance with the district judge . . . ."); H.R. Rep. No. 1667, 85th Cong., 2d Sess. 3 (1958) ("The right of appeal given by the amendatory statute is limited both by the requirement of the certificate of the trial judge, who is familiar with the litigation and will not be disposed to countenance dilatory tactics, and by the resting of final discretion in the matter in the Court of

9

Appeals . . . .").[2] Relying on this language and history, courts have understood the matter of certification to be vested first in the discretion of the district court. *See Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 46 (1995) ("Congress . . . chose to confer on district courts first line discretion to allow interlocutory appeals."). The Supreme Court has long recognized that Congress carefully chose this bifurcated process to preserve the integrity of the final judgment rule. *See, e.g.*, *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 474 (1978), *superseded by rule on other grounds as stated in Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017).

It is hardly surprising that appellate courts, generally reluctant to issue a writ of mandamus to correct a decision within the discretion of the lower court, have been particularly wary of usurping the discretion Congress specifically vested in the district courts under § 1292(b). *See, e.g.*, *In re Ford Motor Co.*, 344 F.3d 648, 654 (7th Cir. 2003) (collecting cases); *Arthur Young & Co. v. U.S. Dist. Court*, 549 F.2d 686, 697–98 (9th Cir. 1977); *In re Mar. Serv. Corp.*, 515 F.2d 91, 92–93 (1st Cir. 1975); *see also In re Trump*, 781 F. App'x 1, 2 (D.C. Cir. 2019). *But cf. Fernandez-Roque v. Smith*, 671 F.2d 426, 431–

---

[2] Only in 1958, after years of extensive deliberation, multiple proposals, and "considerable study" by the Judicial Conference of the United States, S. Rep. No. 85-2434 at 2, did Congress enact § 1292(b). *See* Pub. L. 85-919, 72 Stat. 1770 (1958). One proposal would have permitted an interlocutory appeal upon direct application to the courts of appeals when "necessary or desirable to avoid substantial injustice." Judicial Conference of the United States, Report of the Proceedings of a Special Session 203 (Mar. 20–21, 1952), *quoted in* Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 88 Harv. L. Rev. 607, 610 (1975). The Judicial Conference rejected that proposal, concluding that it would too liberally permit interlocutory appeals. *See Appeals from Interlocutory Orders and Confinement in Jail-Type Institutions: Hearings on H.R. 6238 and H.R. 7260 Before Subcomm. No. 3 of the H. Comm. on the Judiciary,* 85th Cong., 2d Sess. 9 (1958).

32 (11th Cir. 1982). Appellate courts' aversion to issuing a writ of mandamus to direct certification is for good reason. It is always difficult to establish a "clear and indisputable" right to a decision that lies within a court's discretion, but it is particularly problematic when doing so circumvents the specific process Congress has prescribed for seeking interlocutory review.

The President concedes that a "district court has broad discretion in considering" whether the § 1292(b) certification criteria have been met. Pet. at 11; *see also id.* at 2 ("wide discretion"), *id.* at 12 ("significant discretion"). Nonetheless, he maintains that in this case the district court's asserted legal errors amounted to a "clear abuse of discretion" requiring us to issue a writ of mandamus directing the district court to certify an interlocutory appeal. *Id.* at 11. At oral argument, the President's counsel suggested that this asserted "clear abuse of discretion" provides a substitute for the "clear and indisputable" right to relief necessary to obtain a writ of mandamus. Oral Arg. at 6:07–6:15, 8:32–8:53. Thus, the President's argument that we must issue a writ of mandamus ordering the district court to certify an appeal rests entirely on his contention that the magnitude of the district court's asserted error transforms the mandamus requirement that a petitioner establish a "clear and indisputable" right to relief into a requirement that the petitioner show a legal error amounting to a "clear abuse of discretion." The second dissent echoes this argument, maintaining that the district court's refusal to certify was assertedly not "guided by sound legal principles" and for this reason amounted to a "clear abuse of discretion." Second dissent at 83 (internal quotation marks omitted); *see also id.*

11

(suggesting that the district court's opinion was "unmoored from the governing legal principles").

But the contention that a naked error of law amounts to an abuse of discretion entitling a petitioner to mandamus relief has been repeatedly rejected by the Supreme Court. More than fifty years ago, after noting it was "unnecessary to reach" the question of whether the district court had erred, the Court counseled appellate courts to be wary of issuing writs of mandamus:

> Courts faced with petitions for the peremptory writs must be careful lest they suffer themselves to be misled by labels such as "abuse of discretion" and 'want of power' into interlocutory review of nonappealable orders on the mere ground that they may be erroneous.

*Will v. United States*, 389 U.S. 90, 95, 98 n.6 (1967).

The Supreme Court has never wavered from the view that, while "a simple showing of error may suffice to obtain a reversal on direct appeal," it does not permit an appellate court to issue a writ of mandamus. *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 661 (1978); *accord Bankers Life*, 346 U.S. at 382.[3] To hold otherwise "would undermine the settled limitations upon the power of an appellate court to review interlocutory orders." *Allied*

---

[3] Nor, contrary to the President's suggestion, does *Cheney* set forth a new, more lenient "clear abuse of discretion" standard for obtaining mandamus relief. In *Cheney*, the Court noted that a petitioner seeking a writ of mandamus must demonstrate "exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion." 542 U.S. at 380 (internal quotation marks and citations omitted). And immediately following this statement, the *Cheney* Court explicitly declared that the long-established "three conditions *must be satisfied* before [a writ of mandamus] may issue," *id.* (emphasis added), including "the burden of showing that [his] right to issuance of the writ is clear and indisputable," *id.* at 381 (internal quotation marks omitted). The Court thus made clear that it did *not* establish a new standard or relax the three conditions necessary for a writ of mandamus to issue.

*Chem.*, 449 U.S. at 35 (internal quotation marks omitted). Thus, the allegation of legal error in the district court's thorough certification analysis — an issue on which we do not pass — provides no basis for us to compel certification under § 1292(b).

The second dissent seeks to bolster its legal error/abuse of discretion argument by claiming that the district court not only erred, but also improperly "attempt[ed] to insulate itself from appellate review." Second dissent at 76. The dissent admits that "each individual decision of the district court in this case purportedly fell within its jurisdictional purview." *Id.* at 77. But the dissent nonetheless maintains that, "viewed holistically," the district court's decisions "evince a purposeful intent by the court to insulate its rulings from appellate review." *Id*. But, no matter how "holistically" the district court's opinions are viewed, actual evidence of the court's "purposeful intent" to "insulate" its rulings from appellate review is nowhere to be found.[4] Rather, the record reflects that the district court adjudicated the motion before it in accordance with the dictates of § 1292(b). The dissent does not deny this. Instead, relying solely on its unsubstantiated viewpoint, the dissent simply assumes that all courts must believe that the certification criteria were satisfied.

---

[4] The weakness of the dissent's "insulation" argument is manifest in its heavy reliance on artful quotation of *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21 (1943). *See* second dissent at 75, 77, 79, 80, 87. The *Roche* Court did not use "thwart[ing] appellate review" to describe a district court following a prescribed statutory procedure. The only example the Court gave of conduct "thwart[ing]" review was a district court that avoids ruling at all on the challenged issue, a scenario not present here. *Roche*, 319 U.S. at 26. Moreover, the Court reiterated its consistent view, one the dissent would have us ignore, that "[w]here the appeal statutes establish the conditions of appellate review an appellate court cannot rightly exercise its discretion to issue a writ whose only effect would be to avoid those conditions and thwart the Congressional policy against piecemeal appeals . . . ." *Id.* at 30. The dissent's partial quotations hence distort *Roche*'s holding beyond recognition.

The dissent's "insulation" argument thus boils down to disagreement as to whether the § 1292(b) criteria have been met. Mere disagreement with the district court, the body that Congress vested with the initial discretion to make that determination, does not constitute evidence that the decision was based on "whim" or that the district court usurped judicial power.

We do not foreclose the possibility that in an appropriate case a writ of mandamus may issue to order a district court to certify an interlocutory appeal under § 1292(b). If the district court ignored a request for certification, denied such a request based on nothing more than caprice, or made its decision in manifest bad faith, issuing the writ might well be appropriate. *See Ex parte Secombe*, 60 U.S. (19 How.) 9, 13–15 (1856) (explaining that a writ of mandamus is not appropriate to correct an erroneous decision within the jurisdiction of the lower court unless the exercise of discretion is used in an "arbitrary and despotic" way or the court issues a decision "from passion, prejudice, or personal hostility"); *see also Ex parte Bradley*, 74 U.S. (7 Wall.) 364, 376–77 (1868) (instructing that a writ of mandamus should not issue to control a decision within the judicial discretion of the lower court unless the challenged act exceeds the court's jurisdiction or the court, motivated by "caprice, prejudice, or passion," exercises its discretion "with manifest injustice"). But here the district court promptly recognized and ruled on the request for certification in a detailed written opinion that applied the correct legal standards. The court's action was not arbitrary or based on passion or prejudice; to the contrary, it "was in its nature a judicial act." *Ex parte Secombe*, 60 U.S. at 15. Notably, notwithstanding the

14

President's vigorous assertion that the court erred in its legal analysis, he does not contend that the district court denied certification for nonlegal reasons or in bad faith.

Accordingly, the President has not shown that he is entitled to a writ of mandamus compelling the district court to certify its orders for interlocutory review under § 1292(b).[5]

IV.

We turn to the President's secondary argument. *See* Pet. at 28–30. The President maintains that, even if we "conclude that the district court's certification discretion under § 1292(b) was sufficiently broad that a writ of mandamus directing certification is unwarranted," we "nevertheless should grant mandamus directing the district court to dismiss [Respondents'] complaint." *Id.* at 28. To obtain this relief, the President must establish that it is not merely *likely*, but "clear and indisputable," that the *entire action* cannot lie. He has not done so.

We recognize that Respondents press novel legal claims. But reasonable jurists can disagree in good faith on the merits of these claims. For example, the President contends that the absence of congressional authorization forecloses the availability of judicial review, relying on *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). Respondents counter that courts routinely recognize causes of action to enjoin conduct that violates the Constitution. *See, e.g.*, *Bond v. United States*, 564 U.S. 211 (2011); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010).

---

[5] The President has not offered any independent argument that he meets the other two criteria for mandamus relief. *See* Pet. at 11.

The President responds that such equitable causes of action are available only as preemptive defenses to enforcement actions. Although that argument is plausible, the cited cases are not obviously limited in this way, and so the President does not have a clear and indisputable right to dismissal of the complaint on this ground. *Accord In re Trump*, 781 F. App'x 1, 2 (D.C. Cir. 2019) ("The question of whether the Foreign Emoluments Clause or other authority gives rise to a cause of action against the President is unsettled . . . ." (citation omitted)).

The President's assertion that the Respondents lack any cognizable injury also presents a debatable question. Respondents do seek to extend established precedent to a novel context. But their argument rests on legal principles that the Supreme Court has expressly endorsed. *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (competitor standing); *Shelby County v. Holder*, 570 U.S. 529, 544 (2013) (states enjoy equal sovereignty in union); *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007) (states are entitled to special solicitude in the standing analysis); *cf., e.g.*, *Am. Legion v. Am. Humanist Ass'n* 139 S. Ct. 2067 (2019) (offended observer standing); *Lynch v. Donnelly*, 465 U.S. 668 (1984) (same).

The President's insistence that "emoluments" indisputably include only "profit arising from office or employ" (that is, payment for services rendered in performance of a formal job), while possible, is certainly not indisputable. Respondents assert that emoluments include "all profits and other benefits [accepted from a foreign or domestic government] that [the President] accepts through the businesses he owns." Before this litigation commenced, no court had ruled on this question, but Respondents point us to

16

several Executive Branch and Comptroller General legal opinions that have arguably interpreted the term consistently with their definition, not the President's. *See* Resp. Br. at 5–6. And multiple amici have submitted briefs in this and the companion case, No. 18-2488, urging still different understandings of the term emolument. *See, e.g.*, Brief of Amici Curiae Professor Clark D. Cunningham and Professor Jesse Egbert on Behalf of Neither Party, *In re Trump* (No. 18-2486), 2019 WL 366218; Brief for Amici Curiae Certain Legal Historians in Support of Plaintiffs-Appellees and in Opposition to Petition for Writ of Mandamus, *In re Trump* (No. 18-2486), 2019 WL 654726. Finally, within the Executive Branch, officials have acknowledged there is considerable debate about this issue. *See* Office of Inspector Gen., U.S. Gen. Servs. Admin., *Evaluation of GSA's Management and Administration of the Old Post Office Building Lease* 5 (2019) (finding that lawyers from the General Services Administration "all agreed early on that [the President's lease of the D.C. Hotel] was a possible violation of the Constitution's Emoluments Clauses"). Given this history, we can hardly conclude that the President's preferred definition of this obscure word is clearly and indisputably the correct one.

In sum, while precedent offers guidance, it does not dictate a particular outcome on the facts alleged in the President's petition.[6] When assessing whether to issue a writ of

---

[6] The first dissent rejects this holding, proclaiming at length that of course the President is entitled to the extraordinary relief he seeks, and that our contrary view is improperly motivated. The dissent portrays us as "partisan warriors" acting with an "absence of restraint . . . incompatible with the dictates of the law." First dissent at 29–30. But we remain confident that our narrow holding, reached with careful attention to the standard of review, is the essence of restraint. Readers may compare our measured approach with the dramatics of the dissent and draw their own conclusions.

mandamus, a court does not balance the respective merits of the parties' arguments but instead determines whether the petitioner has established a clear and indisputable right to the writ.[7]  The President, the petitioner in this case, has not done so.

## V.

Finally, we turn to the contention that separation of powers concerns require us to issue a writ of mandamus.

## A.

The President, relying on *Cheney*, argues that we must issue a writ of mandamus because this suit, like that in *Cheney*, subjects the Executive Branch to "intrusive discovery."  Pet. 29.

This is a puzzling argument given that, unlike the Vice President and the other petitioners in *Cheney*, the President has *not* petitioned for relief as to any discovery order. In any event, *Cheney* offers no assistance to the President here.  The challenged discovery in that case required production of communications among Executive Branch officers appointed by the President to advise him on the nation's energy policy.  No one disputed that these communications were undertaken pursuant to the President's power to solicit advice and recommendations from his subordinates; the case concerned whether the

---

[7] That the respondents' claims may eventually be found noncognizable does not mean that rejection of them is clearly and indisputably foreordained.  *Cf. In re United States*, 884 F.3d 830, 836–37 (9th Cir. 2018) (denying a mandamus petition that contended that novel claims for climate change–related harms asserted directly under the Constitution were noncognizable, would result in intrusive discovery, and violated separation of powers, and that respondents lacked standing).

discovery orders would impair the functioning of the Executive Branch. In contrast, the discovery here — business records as to hotel stays and restaurant expenses, sought from private third parties and low-level government employees — implicates no Executive power. The President has not explained, nor do we see, how requests pertaining to spending at a private restaurant and hotel threaten any Executive Branch prerogative.[8]

Perhaps recognizing the difficulty with his *Cheney*-based discovery argument, the President briefly asserts that the separation of powers discussion in *Cheney* supports his claim that he is entitled to a writ of mandamus to immunize him "from judicial process." Pet. at 29 (internal quotation marks omitted). That contention is meritless. Indeed, *Cheney* approvingly cited *Clinton v. Jones*, in which the Supreme Court rejected precisely this argument. *Cheney*, 542 U.S. at 388 (citing *Clinton v. Jones*, 520 U.S. 681, 705 (1997)).

B.

The dissenters embroider on the separation of powers argument, maintaining that no court can order the President to comply with the Emoluments Clauses. According to the dissenters, these clauses vest the President with a discretionary duty and, pursuant to *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866), the judiciary cannot direct or otherwise interfere with the performance of this duty.

The argument that the President's emoluments-related actions are judicially unreviewable rests on two premises, both of which collapse under scrutiny. The first is

---

[8] Of course, the President can always seek relief from intrusive or overbroad discovery orders from the district court and, failing that, through a petition for a writ of mandamus, just as the Vice President did in *Cheney*.

that every requirement or obligation that the Constitution imposes on the President provides him with an official executive duty. That is simply not so. For example, the Constitution requires that the President attain the age of 35 and be a natural-born citizen. U.S. Const. art. II, § 1, cl. 5. Those constitutional dictates, like the Emoluments Clauses, do not vest the President with any duty to execute the law. They are, rather, *restraints* on the President. Indeed, as the dissenters acknowledge, the Founders themselves recognized that the Foreign Emoluments Clause constitutes a restraint. *See* second dissent at 89 (quoting 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 465 (Jonathan Elliot ed., 2d ed. 1836) ("The [Foreign Emoluments Clause] *restrains* any person in office from accepting of any present or emolument, title or office, from any foreign prince or state." (emphasis added))).

Such restraints are positive law, and of course the President must comply with the law. The duty to do so, however, is not a uniquely official executive duty of the President, for in the United States, every person — even the President — has a duty to obey the law. The duty to obey these particular laws — the Constitution's Emoluments Clauses — flows from the President's status as head of the Executive Branch, but this duty to obey neither constitutes an official executive prerogative nor impedes any official executive function.

Moreover, even if obeying the law were somehow an official executive duty, such a duty would not be "discretionary," but rather a "ministerial" act within the meaning of *Johnson*. The dissents disagree, arguing that this duty is not only an official executive duty, but also one that encompasses the discretionary function of determining the meaning of "emolument." *See* first dissent at 42–44; second dissent at 91; second dissent in No. 18-

20

2488.    That argument rests on another faulty premise — that defining the term "emolument" is an executive function.  Although the Constitution entrusts the President with the enormous responsibility of faithfully executing the law, *see* U.S. Const. art. II, § 3, cl. 5, the notion that the President is vested with unreviewable power to both execute and interpret the law is foreign to our system of government.  *Cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  The Framers, concerned about the corrosive effect of power and animated by fears of unduly blending government powers, dispersed the authority to enforce the law and the authority to interpret it.  To hold otherwise would mean that the President alone has the ultimate authority to interpret what the Constitution means.  Allowing the President to be the final arbiter of both the interpretation and enforcement of the law — as the dissents would — would gravely offend separation of powers.  Rather than sanction an "assault by the judicial branch against the powers of the executive," first dissent at 27, our holding affirms the separation of powers principles dictated by the Constitution and endorsed by centuries of foundational jurisprudence.

## VI.

The procedural posture in which this case comes to us — a petition for a writ of mandamus — is not window dressing.  A petitioner must establish a clear and indisputable right to the relief sought for a writ of mandamus to issue, and the President has not done so.  Accordingly, the petition is

*DENIED.*

21

WYNN, Circuit Judge, with whom Judges KEENAN, FLOYD, and THACKER join, concurring:

Without a doubt, a lawsuit brought by the State of Maryland and the District of Columbia against the President of the United States catches attention outside the walls of the courthouse. How then should the Court avoid the appearance of partiality when there are eyes upon it? By applying the law and abstaining from grandiose screeds about partisan motives. Or, put another way—*by doing its job*. And that is exactly what the excellent majority opinion does.

But to the contrary, our dissenting colleague insinuates that "something other than law [is] afoot" here. First dissent at 60 (Wilkinson, J.). He makes much of the fact that "[n]o federal court has ever allowed a party to sue the President under the Domestic [and Foreign] Emoluments Clause[s]." *Id.* But all of us, majority and dissent alike, recognize that this is a novel case.

Novelty, of course, is not new to our courts. As a matter of fact, novel issues occur frequently. Judges everywhere call them "issues of first impression"—issues that require courts to engage in decision-making with seriousness and fairness. When faced with difficult and challenging questions, it may be tempting to invoke politics to justify declaring that we "have not the slightest idea" what to do. *Id.* at 28. But we must resist.

That is particularly true in this matter because even the best efforts to editorialize this case as a political fray must acknowledge that the State of Maryland and the District

22

of Columbia present a simple, non-political question: Should mandamus[*] issue to override the district court's discretion not to certify an interlocutory appeal? The answer is equally simple: No.

To evade that simple answer, the second dissenting opinion resorts to a baseless (and novel) assertion that the district court's "several decisions, when viewed holistically" amount to judicial usurpation. Second dissent at 77 (Niemeyer, J.); first dissent at 26 n.1 (Wilkinson, J.) (noting agreement with second dissenting opinion).

Editorial writers, political speechwriters, and others are free, of course, to make a career out of accusing judges who make decisions that they dislike of bias and bad faith. But the public's confidence and trust in the integrity of the judiciary suffer greatly when judges who disagree with their colleagues' view of the law accuse those colleagues of abandoning their constitutional oath of office. *See* second dissent at 63 (concluding the district court "purposefully endeavored" to ensnare the President in litigation and the majority now contrives to "protect[]" the district court).

And yet our dissenting colleague also grieves the "loss of that distinct and noble character of non-partisanship and self-restraint, which our forebears on the bench worked mightily to build and which our judicial generation has no right to disassemble." First dissent at 29. If this case represents that loss, it is because the dissenting opinions, in a disappointing display of judicial immodesty, have made this case into something it is not.

---

[*] The writ of mandamus, a drastic remedy, is traditionally employed to compel ministerial duties—i.e., duties that involve no exercise of judgment and leave nothing to discretion. *See id.* at 43.

23

The dissenting opinions abandon notions of judicial temperament and restraint by commandeering this case as a vehicle to question the good faith of judges and litigants that are constituent members of our Union.

Not content with disparaging the judges in the majority as political hacks, our dissenting colleague also bemoans at length this Court's refusal to resolve many questions not before it: whether the Emoluments Clauses provide a basis for relief, what type of relief might address the asserted injuries, and whether one type of relief—an injunction against the President—is appropriate in our constitutional system despite being unknown to the subjects of King George III. *Id.* at 28, 37, 39.  But looking solely to the law, the reason for not addressing those questions is simple: "A litigated case is not a symposium . . . , and whatever views we may have on these issues must be left for another day." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 659 (4th Cir. 2019) (Wilkinson, J.).

That reason fully explains why the majority opinion only addresses the legal issue actually before our Court—whether a party has demonstrated entitlement to a writ of mandamus. The majority opinion's painstaking adherence to settled law in the staid domain of procedure exemplifies a conservative and traditional approach of deciding those issues which need to be resolved, rather than opining on speculative issues that may never come before us. Doing otherwise would amount to unfettered judicial activism.

To put it plainly: Judges strive to do right under the Constitution. Still, our dissenting colleague fears the "partisan fevers [that] grip the national government" and urges this Court to "operate as a non-partisan counterweight and discourage suits whose inevitable denouement will make us part of the political scrum." First dissent at 29. But

deciding which suits we should "discourage" because they may have political implications is itself a political choice. And of course, even deciding what constitutes the "political scrum" is a choice rooted in policy concerns, the perception of which lies in the eye of the beholder. What our dissenting colleague is really saying is that judges should forecast the outcome of a lawsuit and "discourage suits [having an] [anticipated] denouement [that] will [associate them with a political view they dislike]."

Such a naked policy choice belongs to the Executive or Legislative Branches of Government and has no place in the Judicial Branch. Instead, ours is a distinct and noble tradition of guarding citizens' constitutional rights when the political branches fail—a tradition "which our forebears on the bench worked mightily to build." *Id.* We have a duty to do our level best to do equal right to the parties who appear before us. *See* Statement from Roberts, C.J., to the Associated Press (Nov. 21, 2018).

When all is said and done, the majority opinion here represents a dedicated group of judges doing just that.

25

WILKINSON, Circuit Judge, with whom Judges NIEMEYER, AGEE, RICHARDSON, QUATTLEBAUM, and RUSHING join, dissenting:

I respectfully dissent from the denial of mandamus relief in this case. I would return it to the district court with directions to dismiss it forthwith. I make but one point—that the federal judiciary, no less than the President, is subject to the law. And here the federal judiciary has sorely overstepped its proper bounds.[1]

My friends in the majority chide this dissent for its "dramatics." Maj. Op. 17 n.6. Instead, they give this case the ho-hum treatment as though it were no different from our ordinary fare. I intend no diminution of the ordinary case to note that this case is extraordinary. The majority is using a wholly novel and nakedly political cause of action to pave the path for a litigative assault upon this and future Presidents and for an ascendant judicial supervisory role over Presidential action.

It is clear and indisputable that this action should never be in federal court. The legal foundations for this lawsuit are non-existent. It is a fanciful construct that invites the courts to create rights and duties from thin air. It allows an action to proceed that seeks to enjoin the President directly for official actions while in office. It opens the door to litigation as a tool of harassment of a coordinate branch with notions of competitor standing

---

[1] While I limit my comments to the official capacity suit, I note my agreement with Judge Niemeyer's fine dissenting opinions as to both actions and, in particular, the propriety of a writ of mandamus, the trial court's refusal to issue a § 1292(b) certification order, and on the absence of standing here, which I view as yet another ruling on the complete absence of redressability as to the relief that plaintiffs seek. In other words, as we are not allowed to grant the remedy plaintiffs seek, they are not allowed to ask for it.

so wide and injury-in-fact so loose that litigants can virtually haul the Presidency into court at their pleasure.

Do I fear for an enfeebled Executive? No I do not. But the metastatic spread of litigation, which this case represents, would divert the energies of any institution from what should be its primary focus of good governance.

Consider the insouciant spirit that guides this litigation. It's all make-it-up-as-we-go-along. We are proceeding under constitutional emoluments provisions that confer no right, provide no remedy, and lack all guidance in precedent and history. In so proceeding, the majority ascribes to the courts a lawmaking function that has been committed to the legislative branch.

We move forward to who knows where by leaving Congress, our most democratic branch, on the back stoop in the cold. One would have thought that an assault by the judicial branch against the powers of the executive would at least take place with some democratic imprimatur, with some cognizance of the legislative branch. But our solitary status leaves us undeterred.

We look in vain for evidence of Congress' whereabouts. There are no congressional subpoenas in this case. There is no congressionally created cause of action. There is no word from Congress on what an emolument might be or even the framework in which it should be assessed. There is no recognition given to the powers of Congress to include emoluments abuse in articles of impeachment or to require disclosure by statute of whatever emoluments are thought to be.

27

Years ago, in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), Justice Robert Jackson warned of unilateral executive action taken without thought of sanction or approbation by the other branches of the government. How much more perilous must it be for the judiciary to embark upon its solitary trek without the slightest semblance of democratic input or backing.

And that is not all. Not only is no right conferred upon these plaintiffs in the Bill of Rights or elsewhere; the nature of any remedy is nowhere set forth. Not knowing what an emolument even is, we can hardly fashion a remedy to what by pure guesswork we are supposed to enjoin. If it is the Trump Hotel that gives offense, are we to order its closure for the duration of the President's term? Or are we to command divestiture of any presidential interest, beneficial or otherwise, notwithstanding the fact that divestment is traditionally disfavored in equity? Are we to place this single asset in some sort of not-so-blind trust? Are we to enjoin foreign dignitaries from patronizing the Hotel? Are we to bring in some third party to manage the Hotel's ongoing operations? I have not the slightest idea. Nor am I comforted in the slightest by the majority's assertion that this all lies somewhere down some road.

It is said that no man or woman is above the law, and with that proposition I wholeheartedly agree. But has the President operated above the law by operating, directly or indirectly, an asset acquired well before his Presidency? And if the judiciary is to decide, again without any congressional or democratic input, that the President's arrangements for the operation of the Hotel in a commercial market are somehow above the law, what businessperson will enter public service? The judiciary through its lack of clarity and its

28

novel ambush will succeed in making public service inhospitable to those with lawfully acquired means whose business backgrounds form part of that mix of experiences upon which our Republic relies for its good health and governance. We are widening the chasm between the public and private sectors in our country, adding another schism to those that regrettably already exist.

Finally, in opening the door to suing a President who has visited not the slightest concrete harm on any plaintiff in this action, we invite the judiciary to assemble along partisan lines in suits that seek to enlist judges as partisan warriors in contradiction to the rule of law that is and should be our first devotion. When partisan fevers grip the national government, the judiciary must operate as a non-partisan counterweight and discourage suits whose inevitable denouement will make us part of the political scrum.

It may be that at this time the judicial branch, with its aspirations to be above the fray, is our country's best remaining hope for maintaining public trust. Shall we sacrifice that hope in the service of a lawsuit, which asks us to exercise no traditional judicial power, such as was present in the enforcement of a criminal trial subpoena, see *United States v. Nixon*, 418 U.S. 683 (1974), or such as is present when the power of the government is brought against the rights of citizens that the Constitution has plainly conferred, see *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010)? Exercising the extrajudicial powers invited by this lawsuit assumes as well an extrajudicial risk, the chief of which is the loss of that distinct and noble character of non-partisanship and self-restraint, which our forebears on the bench worked mightily to build and which our judicial generation has no right to disassemble.

29

It is well for some suits to transcend the moment. I hold no brief for the particular conduct of this or any President. I fear only for the future of the courts, where the absence of restraint is so evidently incompatible with the dictates of the law. This is not an occasion for business as usual. We are reaching the point of solving political differences increasingly through litigation rather than through legislation and elections. This is a profoundly anti-democratic development pressed in a suit whose wrongfulness and transparently political character will diminish the respect to which courts are entitled when they carry out the essential functions that our cherished Constitution has assigned them.

## I.

I have thus far confined my comments to the contemporary indefensibility of plaintiffs' request. But it matters not whether a contemporary or historical lens is applied to this suit because the perspectives of past and present blend seamlessly together and require a single conclusion: that the plaintiffs are venturing into virgin territory as anathema to the Founders as it is in the present day.

There are many problems with what the majority has set in motion. The most fundamental is the fact we lack any authority to let this suit go forward. No federal court can provide a remedy in this case. And because a remedy is unavailable at the end of the road, we are forbidden from starting the journey.

## A.

Plaintiffs here seek equitable relief. But the allegations set forth in their complaint do not bring this action within the carefully circumscribed equity jurisdiction of the federal courts. Indeed, history, tradition, and precedent all underscore they lie outside it.

The equity jurisdiction of the federal courts is strictly limited to the "authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939)); see also *Fletcher v. Morey*, 9 F. Cas. 266, 271 (C.C.D. Mass. 1843) (Story, J.). Such suits in equity comprise only those "cases of rights, recognized and protected by the municipal jurisprudence, where a plain, adequate, and complete remedy cannot be had in the Courts of Common Law." 1 Joseph Story, Commentaries on Equity Jurisprudence § 33 (1836); see also *Missouri v. Jenkins*, 515 U.S. 70, 130 (1995) (Thomas, J., concurring).

In other words, to fall within the equitable jurisdiction of the federal courts, a litigant must demonstrate *both* that he has suffered an injury to some legally protected interest *and* that he cannot obtain adequate redress for that injury at law. See *Atlas Life Ins. Co.*, 306 U.S. at 569-70. Plaintiffs cannot clear this threshold inquiry because they fail to satisfy the first prong. That is, their case falls outside of our equitable jurisdiction because they have not alleged "a wrong which directly results in the violation of a *legal right*." *Alabama Power Co. v. Ickes*, 302 U.S. 464, 479 (1938) (emphasis added).

Two sources of law can create legal rights the violation of which may be cognizable in equity. First, the federal courts will enforce the set of rights traditionally protected by courts of equity in 1789. See *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 152 (1951) (Frankfurter, J., concurring) (noting that a litigant may ordinarily "challenge

31

governmental action of a sort that, if taken by a private person, would create a right of action cognizable by the courts"). Second, positive law, such as a federal statute or the Constitution, can create new legal rights that will be enforced by the federal courts in accordance with "the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Grupo Mexicano*, 527 U.S. at 318 (internal quotation marks omitted). Thus, to maintain a cause of action in equity, plaintiffs here must allege injury to either a traditional equitable right or a clear interest created and protected by written law.

Given that, it is important to recall exactly what the Maryland and D.C. plaintiffs are complaining of in this case. The crux of their argument is that, as a result of President Trump's alleged unlawful acceptance of emoluments, guests that otherwise would have patronized their business establishments (and those of their residents) have instead patronized President Trump's Hotel. Importantly, plaintiffs *do not* accuse the Hotel—their alleged competitor—of any wrongdoing or unlawful conduct. Rather, they assert only that the Hotel is an *incidental* beneficiary of the President's actions, which have increased traffic to their competitor and thereby created an "unfair economic playing field." Plaintiffs' Resp. Br. 27. The plaintiffs are at heart claiming what is called a "competitive injury"—lost profits due to increased competition.

The problem for plaintiffs is that their purported injury does not infringe any rights enforceable in equity. Generally speaking, freestanding "competitive injuries" do not constitute legal wrongs traditionally redressable by the courts. And plaintiffs have not identified any written law protecting their interest in being free from lawful competition

32

by the Hotel.  So while plaintiffs may have a grievance, they do not have a *legal injury* that falls within our equitable jurisdiction.  I consider each of these points in turn.

1.

Put simply, plaintiffs do not assert that President Trump's actions have infringed any traditional legal right.  Remember, to maintain a cause of action in the federal courts based solely on rights traditionally protected in equity, plaintiffs must premise their claim on the type of legal injury that could have been brought before the English Court of Chancery in 1789.  *Grupo Mexicano*, 527 U.S. at 318-19; Michael T. Morley, *The Federal Equity Power*, 59 B.C. L. Rev. 217, 233 (2018).  After all, if plaintiffs could call on the federal equity power to vindicate *any* interest, no matter how foreign to English practice at the Founding, the fixed limits on our equitable jurisdiction would quickly become illusory.  See *Missouri*, 515 U.S. at 130 (Thomas, J., concurring) (noting that the Framers insisted that only "the defined nature of the English and colonial equity system—with its specified claims and remedies—would continue to exist under the federal judiciary").

At the time of the Founding, however, it was firmly established under English law that the loss of business incident to lawful competition was not a legally cognizable injury.  As Blackstone explained, it was not unlawful "to set up any trade . . . in neighborhood or rivalship with another," and "if the new [business] occasion a damage to the old one, it is *damnum absque injuria*," *i.e.*, damage without injury.  3 W. Blackstone, Commentaries on the Laws of England 219 (1768) (hereinafter "Blackstone").  This proposition is supported by a line of precedents stretching back to Henry IV.  See, *e.g.*, *Hamlyn v. More*, Y.B. 11 Hen. 4, fo. 47, Hil., pl. 21 (1410) (Eng.) (Hankford, J.) ("[I]f I have a mill and my neighbor

33

sets up another mill, so that the profit from my mill is reduced, I shall have no action against him."); *Keeble v. Hickeringhall*, 91 Eng. Rep. 659 (Q.B. 1707) (same).

The courts of this country have unsurprisingly applied the same rule. Faithful to the bounds of the judicial power, federal courts have consistently refused to grant equitable relief to plaintiffs complaining only of competitive harm. See, *e.g.*, *New Orleans, M. & T.R. Co. v. Ellerman*, 105 U.S. 166, 173-74 (1881) (holding that lawful competition "does not abridge or impair any [legal or equitable] right"); see also Louis L. Jaffe, Judicial Control of Administrative Action 509 (1965) ("[O]ur common law does not protect a person from competition . . . on the contrary free trade has become its guiding rule.").

Critically, this principle applies even where, as here, plaintiffs allege that they face increased competition due to *government action* that benefits their competitor. As Justice Black put it, "neither damage nor loss of income in consequence of the action of Government, which is not an invasion of recognized legal rights, is in itself a source of legal rights." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 125 (1940). Such was the holding in *Alabama Power*, where several power companies sought to enjoin the execution of allegedly unconstitutional loan agreements between the federal government and competing municipal power companies. 302 U.S. at 473-75. The Supreme Court responded that plaintiffs had no right to equitable relief because even if their "business be curtailed or destroyed by the operations of the municipalities, it will be by lawful competition from which no legal wrong results." *Id.* at 480.

In short, so long as the actions of the competing entity itself are lawful, a plaintiff suffers no injury cognizable in equity. See *Tenn. Elec. Power Co. v. TVA*, 306 U.S. 118,

34

137-39 (1939). Thus, even if President Trump's actions have incidentally cost plaintiffs business, it amounts to nothing more than *damnum absque injuria* so long as the Hotel itself is operating lawfully. And without legal injury, plaintiffs cannot avail themselves of our equitable jurisdiction.

In response, plaintiffs assert that "[c]ourts have long recognized that a plaintiff has a legally cognizable interest in challenging unlawful conduct that undermines his ability to participate in a competitive market on equal terms." Resp. Br. 46. Doubtless. But those decisions were premised on *written* law creating and protecting such interests—not on traditional equitable rights. Indeed, such cases are largely outgrowths of the administrative state, which "brought legislation creating countless new interests that had not been protected at common law." John A. Ferejohn & Larry D. Kramer, *Independent Judges, Dependent Judiciary: Institutionalizing Judicial Restraint*, 77 N.Y.U. L. Rev. 962, 1008 (2002). In other words, this body of law—where comprehensive regulatory schemes define competitive injuries with particularity and where would-be plaintiffs benefit from the "generous" statutory judicial review provisions of the Administrative Procedure Act, *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987)—does not stand for the proposition that lawful competition alone can cause legally cognizable injury. Rather these cases speak to the entirely separate point that where written federal law creates a new legal right to be free of competition in a given context or permits it only on certain terms, a court sitting in equity may enjoin government action that is violative of that right.

To see this proposition in action, consider *The Chicago Junction Case*, 264 U.S. 258 (1924). There, plaintiffs asked the court to invalidate an order of the Interstate

35

Commerce Commission that had authorized a competing company to acquire a terminal road. *Id*. at 260-62. The Supreme Court held that plaintiffs suffered a legally cognizable injury, but "not the incident of more effective competition." *Id.* at 267. Instead, the ICC order had violated the plaintiffs' right to "equality of treatment," which was created and protected by the Interstate Commerce Act. *Id.* The Court later clarified that, "*but for* [the] express statutory provision creating a different rule," plaintiffs in *Chicago Junction* would not have alleged any legal injury. *Alabama Power*, 302 U.S. at 483-84 (emphasis added).

In sum, plaintiffs do not allege harm to any right traditionally vindicated by courts of equity. And the strict bounds of our equity jurisdiction under Article III render the federal courts powerless to unilaterally create and protect such a right.

2.

In light of the foregoing, if this case is to proceed, plaintiffs must identify some right created by positive law that has been invaded by President Trump's actions. As previously noted, absent a clear analogue from traditional equity practice, a plaintiff may base a claim of legal injury on the invasion of "an interest created by the Constitution or a statute." *McGrath*, 341 U.S. at 152 (Frankfurter, J., concurring); see also *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 461 (1977) (recognizing that Congress can create new substantive rights "unknown to the common law"). And where a "statute creates a new equitable right of a substantive character, which can be enforced by proceedings in conformity with the pleadings and practice appropriate to a court of equity, such enforcement may be had in a federal court." *Henrietta Mills v. Rutherford Cty.*, 281 U.S. 121, 127 (1930). "But if no comparable common-law right exists

36

and no such constitutional or statutory interest has been created, relief is not available judicially." *McGrath*, 341 U.S. at 152 (Frankfurter, J., concurring).

Everyone agrees there is no statutory provision at issue. So the plaintiffs here cannot go the way of the plaintiffs in *Chicago Junction* or related cases. Rather, they must find their legal interest, if at all, in the Constitution itself. But this search is in vain.

The Supreme Court has repeatedly cautioned that "a major departure from the long tradition of equity practice should not be lightly implied." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). Neither the plaintiffs nor the majority have offered even the thinnest rationale for why the Emoluments Clauses would justify such a departure. They have pointed to nothing in the history of the drafting or ratification of the Clauses to remotely suggest that the Founders intended to create a new legal interest for parties to be protected from lawful competition—an interest wholly unknown to traditional equity practice. Further, the text of the Clauses does not contain *any* rights-conferring language, let alone something resembling the sort of comprehensive regulatory scheme that typically gives rise to competitive injury suits. And the government action complained of here is not "agency" action subject to the "generous" review provisions of the APA. See *Clarke*, 479 U.S. at 400 n.16. Rather, we are faced with two discrete structural provisions of the Constitution designed to prevent official corruption—provisions, as I will discuss below, that are not and never have been judicially enforceable in their own right. In short, there is not a colorable argument that the Emoluments Clauses, on their own, create a legal interest that would allow the plaintiffs to avail themselves of our equitable jurisdiction.

For these reasons, the plaintiffs have essentially failed to state a claim upon which relief can be granted, because their particular "competitive injury" does not contain a *legal* injury cognizable in equity. That should end this case. Regrettably, my colleagues in the majority, content with kicking the can down the road and untroubled by such parochial concerns as the scope of our Article III powers, decide to let this futile action proceed.

B.

The above is only the first of two fatal defects with the plaintiffs' claim. The federal equity power is further constrained by the structure of the Constitution. See 1 John N. Pomeroy, A Treatise on Equity Jurisprudence § 294 (A. L. Bancroft & Co. 1881). This means, at a minimum, that the federal equity power cannot extend beyond what the separation of powers will allow. See *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 104-07 (1945).

But as redress for their purported injuries, plaintiffs ask for something extraordinary: an injunction issued directly against the President of the United States. To date, I am not aware of a single case where a federal appellate court has allowed a claim premised on this mode of relief to move forward. Until now. In reaching this unprecedented outcome, the majority has laid aside the inspired design of our constitutional order in exchange for the ephemeral rush of a judicial power unbound. I would instead keep to the longstanding rule impelled by the history and structure of the Constitution: federal courts cannot enjoin the President in connection with the performance of his official duties.

38

1.

The Supreme Court first articulated this limit on our equitable jurisdiction in *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867).  There, Mississippi sought an injunction to stop President Andrew Johnson from enforcing the Reconstruction Acts on the ground that the Acts were unconstitutional.  The Court rejected any notion that the federal judiciary had the power to issue such a remedy, squarely holding that the federal courts could not "enjoin the President in the performance of his official duties." *Id.* at 501.

The *Mississippi* decision reflected what was already settled law at the time.  For one, this kind of equitable remedy would have been unheard of at the English Court of Chancery in 1789.  See Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 425 (2017) ("In English Equity before the Founding of the United States, there were no injunctions against the Crown.").  And, at the time, no federal court had ever sustained an injunction directly against the President.  *Mississippi*, 71 U.S. at 500 ("It was admitted in the argument that the application now made to us is without a precedent; and this is of much weight against it.").

Since *Mississippi*, the federal courts have continued this practice *without exception* and have not sustained a single injunction against the President in his official capacity.  *Newdow v. Bush*, 355 F. Supp. 2d 265, 282 (D.D.C. 2005) (recognizing the absence of any example where "an injunction against the President [has been] issued and sustained by the federal courts").  Over the course of this nation's entire existence, there has been an "'unbroken historical tradition . . . implicit in the separation of powers' that a President may not be ordered by the Judiciary to perform particular Executive acts." *Clinton v. Jones*,

520 U.S. 681, 719 (1997) (Breyer, J., concurring) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and concurring in the judgment)); see also *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him").

Ordinarily, this sort of uniform historical record is supposed to count for something. The Supreme Court has repeatedly made clear that history has independent doctrinal significance in resolving separation of powers questions. *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014). In particular, when the scope of a given power is not readily apparent from the face of the Constitution—such as the contours of the "judicial power" vested in the federal courts by Article III—practice should illuminate meaning. See *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981).

To that end, history is especially instructive when one branch of government claims a novel power against another—such as the judiciary asserting the authority to enjoin the chief executive—but cannot point to a single instance of having used it. In a system of government where ambition was made to counteract ambition, the Constitution does not keep hidden the consequential powers of the respective branches. So when one branch claims to stumble upon a previously unknown font of authority that would materially affect the separation of powers, chances are it is grasping for something beyond its constitutional bounds. See *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) ("Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for [it]."). These principles ring loudly

40

in this case.  The dearth of a *single* example of such an injunction sustained directly against the President, despite untold chances, speaks volumes about our authority to permit one.

Moreover, this unbroken historical practice makes perfect sense because *Mississippi*'s core holding is compelled by the structure of the Constitution.  As the *Mississippi* Court recognized, "the President is the executive department." *Mississippi*, 71 U.S. at 500.  He accordingly "occupies a unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982), because the executive power of the entire government finds its summation in the President alone, U.S. Const., Art. II, § 1.  For this reason, "as far as his powers are derived from the constitution, [the President] is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power." *Kendall v. United States ex. rel. Stokes*, 37 U.S. (12 Pet.) 524, 610 (1838).

A moment's reflection reveals why: the integrity of the separation of powers depends on no branch being able to commandeer another.  See *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("The general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other."). On that score, because "the President is the executive department," *Mississippi*, 71 U.S. at 500, to control him, in any official capacity, is to control the executive branch itself.  But the judiciary may not coopt the executive power any more than the executive can attempt to sit atop the judicial power.  See *Hayburn's Case*, 2 U.S. (2 Dall.) 408 (1792).  And the federal equity power must conform to the structure of the Constitution.  As such, the federal

41

courts may not use their powers in equity to force the President, as chief executive, to perform his official duties in any particular manner.

2.

*Mississippi* settles this case. Compliance with the Emoluments Clauses is an official duty of the presidency—it is a legal requirement that applies to the President by virtue of the very fact he is President, binding on him only for the duration of his time in office. And under *Mississippi*, as confirmed by the history and structure of the Constitution, we lack the capacity to enjoin the President in the performance of such a duty.

Perhaps aware of the rather apparent obstacle *Mississippi* poses to their desired outcome, the plaintiffs try to sidestep the case entirely by emphasizing, rather curiously, that how a President structures his personal finances is not inherently an official executive action. Of course it is not. But that is also beside the point. *Mississippi* speaks of "official duties," and whether something is an official *duty* turns on the nature of the obligation, not the means of complying with it. Only a lawyer would maintain that an obligation (*i.e.*, a duty) that derives from one's government position (*i.e.*, office) is not an "official duty." As I see it, compliance with the Emoluments Clauses is an official duty of the presidency because it flows directly from the Constitution as a requirement of the office, even if complying with that duty may involve colloquially private activities like setting up a trust.

Relatedly, compliance with the Emoluments Clauses is not a "ministerial duty." True enough, in *Mississippi*, the Supreme Court left open whether the federal courts could enjoin the President to perform a "ministerial duty." 71 U.S. at 498-99. But the federal courts have never sustained an injunction on this basis. *Swan v. Clinton*, 100 F.3d 973,

978 (D.C. Cir. 1996) ("We have, however, never attempted to exercise power to order the President to perform a ministerial duty."). And, in any event, this narrow exception could only apply to "simple, definite" duties where "nothing is left to discretion." *Mississippi*, 71 U.S. at 498.

In other words, once an official responsibility involves the "exercise of judgment," it is a non-ministerial official duty. *Mississippi*, 71 U.S. at 499. That describes compliance with the Emoluments Clauses. As the facts of this case make plain, compliance in practice is not a "simple, definite" endeavor; rather, it involves seemingly innumerable judgment calls about how a President must organize his financial interests, sequester his real assets, or restructure his holdings. To put a finer point on it, compare these sorts of choices with what was required in the quintessential example of a ministerial duty: the delivery of the commission in *Marbury v. Madison*. There, Marbury's commission had been signed and sealed, but not delivered. The Secretary of State was required by law to just hand over the parchment, a function that required *no* judgment and where *nothing* was left to discretion. Such a rote errand is different in kind from the sort of discretionary conduct at issue here.[2]

---

[2] The plaintiffs muddle this point by arguing that while the *manner* of compliance with the Emoluments Clauses could involve judgment, the decision of *whether* to comply is non-discretionary: in short, no emoluments means no emoluments. But this simplistic refrain proves too much. For one, the Supreme Court rejected this exact sort of rationale in *Mississippi*, where the state tried to say that the President's duties under the Take Care Clause were also mechanistic (that is, following the Constitution means following the Constitution). What's more, plaintiffs' interpretation of the Clauses would necessarily brand George Washington a repeat violator—a conclusion that ordinarily speaks more to flaws in a given constitutional interpretation than it does to the first President's conduct. See *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067, 2087-89 (2019). Washington likely purchased several plots of land from the federal government while President; continued to export crops overseas; and received, without consent of Congress,

For what it is worth, the district court's interpretation of the Emoluments Clauses, left in place by the majority, gives away the farm on this point. In order to gerrymander a reading of the Clauses that is broad enough to cover *this* President but narrow enough to avoid all the others, the district court carved out an exception for so-called "de minimis" emoluments. But this move gives with one hand and takes with the other; specifically, it forecloses the position that compliance with the Emoluments Clauses can be characterized as a ministerial duty. Indeed, reasonable minds cannot differ that it takes at least *some* "exercise of judgment," *Mississippi*, 71 U.S. at 499, to figure out if a given "emolument" (whatever that is) is sufficiently "de minimis" (whatever that is) such that it falls outside "the contemplation of the Clauses," *District of Columbia v. Trump*, 315 F. Supp. 3d 875, 899 (D. Md. 2018). And once that point is granted, then *Mississippi* controls, placing enforcement of the Emoluments Clauses beyond our equitable jurisdiction.

Even the plaintiffs disclaim the district court's "de minimis" exception to what constitutes an emolument. See Resp. Br. 6 ("The word 'emolument' as used in the Clauses, accordingly covers 'any profits' accepted from a foreign or domestic government. . . . That is true . . . even when the amount accepted was small."). Instead, the plaintiffs have argued an emolument covers "any" profit, gain, or advantage the President might receive. Resp. Br. 30. Contending the emolument prohibition brooks no exceptions, the plaintiffs have

---

numerous diplomatic gifts from France. And he was by no means an aberration. See Douglas R. Hume, *Between "The Rock" and a Hard Case: Application of the Emoluments Clauses for a New Political Era*, 2018 Pepp. L. Rev. 68, 75-76 (noting analogous examples for Jefferson, Madison, and Monroe); Amandeep S. Grewal, *The Foreign Emoluments Clause and the Chief Executive*, 102 Minn. L. Rev. 639, 657-58, 662-63 (2018) (same for Reagan and Obama).

consistently alleged it must be broadly construed to cover "anything of value," Am. Compl. ¶¶ 24, 25, 26, 134.[3] That is, until oral argument in this en banc appeal. There, when confronted with various examples of commercial investment returns that indisputably constitute something "of value," the plaintiffs changed course and now say "any" profit, gain, or advantage is "not necessarily" an emolument—*de minimis* or otherwise—if others not subject to the Clauses might also receive such largesse. Oral Argument at 1:02:41-43, *In re Donald J. Trump* (No. 18-2486); *id.* at 1:03:18-22 (an emolument is "any particular type of advantage that is not available to everyone else"). All of which confirms that determining an emolument of necessity requires "exercise of judgment" as the definition seems to shift upon each exigency.

To repeat, the federal courts have *never* sustained an injunction against the President in connection with the performance of an official duty. But they have at times enjoined his subordinates when doing so would provide adequate relief in a given case. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), is but one example in this long line of precedents. There, the Court sustained an injunction against the Secretary of Commerce, who was trying to enforce an executive order promulgated by President Harry Truman, rather than President Truman himself. Indeed, *Youngstown* stands not only for the

---

[3] Plaintiffs similarly contend that an "emolument" constitutes such broad categories of benefits as: "something of value," "improper incentives," or "private enrichment," Am. Compl. ¶ 6; "payments, benefits, and other valuable consideration", *id.* ¶ 9; anything that may "boost[] th[e] patronage of [the President's] enterprises," *id.* ¶ 13; "payments, transactions granting special treatment, and transactions above marginal cost," *id.* ¶ 25; as well as "monetary and non-monetary gifts or transactions, transactions granting special treatment, and transactions above marginal cost," *id.* ¶¶ 134, 140.

separation of powers axiom that no one branch should charge alone on matters of national importance, as noted, but it also underscores the constitutional necessity of the judiciary separating the President, as chief executive, from his subordinate officers within the executive branch.

This distinction, in fact, makes all the difference. See Jaffe, Judicial Control of Administrative Action 363 ("[The President] is 'the executive' in the sense that his subordinates are not."); see also *Myers v. United States*, 272 U.S. 52, 132-33 (1926). So much so for at least two reasons. First, more formally, when a federal court enjoins the conduct of a subordinate executive officer, it may frustrate the President's will in a specific instance, but it does not seize the very reins of the executive branch by exercising control over "the executive department" itself. *Mississippi*, 71 U.S. at 500; see also *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996). Second, more functionally, the President is "entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," *Fitzgerald*, 457 U.S. at 750, and how he decides to allocate his energies and attentions in an official capacity is itself owed constitutional protection. By contrast, when the judiciary enjoins subordinate executive officers, whose positions are often creatures of statute tasked with discrete and circumscribed roles, the level of intrusion into the executive branch's fluid operation is far less severe.[4]

---

[4] Relatedly, the plaintiffs' reliance on cases like *United States v. Nixon*, 418 U.S. 683 (1974), misses the mark. *Nixon* involved a prototypically traditional judicial action—the issuance of a subpoena in a criminal matter—and stands for the simple proposition that the President does not shed every aspect of his ordinary citizenship when he takes office. It is quite the leap, to say the least, to take the point that the President is not absolutely immune from *all* judicial process as near-dispositive support for the unprecedented idea

46

That said, the fact that there is no subordinate officer available to stand in for the President in *this* case is of little consequence. To be sure, the plaintiffs claim that if an injunction cannot run against the President directly in this matter, then no equitable relief is available at all for them.[5] But that reality, whatever political salience it may or may not possess, has no bearing on the *legal* question before us. This case, at heart, is about power—specifically, whether the federal courts can use the judicial power of the United States to compel the President to perform an official duty in a particular manner. And that question turns principally on the President's unique status within our constitutional system, a position that does not vary depending on the availability or variety of subordinate executive officers potentially amenable to suit. In fact, to hold that the absence of such a subordinate officer changes the constitutional calculus is to countenance the notion that the judicial power must extend as far as needed to be effective; that the federal equity power must always stretch long enough to offer remedial force. While this promise of soon-to-come judicial superiority might be intoxicating today, it would be *horribilis* to the Founders, see, *e.g.*, The Federalist No. 78, at 402 (Hamilton) (George W. Carey & James McClellan, eds., 2001) (hereinafter "The Federalist") ("[T]he judiciary . . . has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the

---

that the judiciary can subject the President to the *kind of process* at issue here—an injunction directing him, in an official capacity, to perform an *official duty* of his office.

[5] It is also not possible for any private parties, be it members of the President's family or employees of the Trump Organization, to stand in for him in this case. For one, the plaintiffs have requested relief directly against the President, *i.e.*, that *he* divest *his* stake in the Hotel. More importantly, this is an official capacity action. As such, the plaintiffs must allege a wrong that can be redressed by a court order against a *government actor* in his official capacity.

society; and can take no active resolution whatever."), and it is a marked departure from the respect one branch of government owes another.

With inexplicable ease, the majority asserts that the mere existence of this lawsuit does not threaten separation of powers. I agree that this lawsuit does not merely threaten separation of powers. It violates them in a way, as explained above, that no federal court of appeals has ever done before. At bottom, plaintiffs are asking for a remedy not only foreign to traditional equity practice, but also in the teeth of our Constitution's structure. Why such a suit merits a single moment more in federal court, as the majority permits, is beyond me.

## C.

The plaintiffs also seek a declaratory judgment "stating that [President Trump] has violated and will continue to violate the Foreign and Domestic Emoluments Clauses." J.A. 182. We are similarly powerless to grant this mode of relief.

We have no more power to issue a declaratory judgment against the President regarding the performance of an official duty than we do an injunction. Much as the President's unique constitutional status bars the federal courts from *directing* his exercise of the "executive power," the federal judiciary is prohibited from subjecting him to their *declaration* of how he should wield the same. *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment) ("It is incompatible with [the President's] constitutional position that he be compelled personally to defend his executive actions before a court."); see also *Roberts*, 603 F.3d at 1013. Suits for declaratory relief also pose the same functional concerns that militate against injunctions; namely, the

48

diminution of the President's attentions and energies with respect to his official duties. In short, the structure of the Constitution forecloses this form of relief for the plaintiffs here.

What is more, as noted *supra*, no federal court has the power to grant coercive relief against the President in this case. And without the ability to supply coercive relief on the back end—that is, without the ability to ultimately provide an injunctive remedy—we are without the power to opine on the front end. See *Vaden v. Discover Bank*, 556 U.S. 49, 70 n.19 (2009) (noting that the Act "does not enlarge the jurisdiction of the federal courts; it is procedural only" (internal quotation marks omitted)); see also *Samuels v. Mackell*, 401 U.S. 66, 72 (1971); *Powell v. McCormack*, 395 U.S. 486, 499 (1969). As such, granting declaratory relief here would be a quintessential (and barred) example of providing an advisory opinion. See *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); see also *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240-41 (1937) (noting the Act's application is limited to actual "controversies," *i.e.*, those that are "appropriate for judicial determination" and "admit[] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be"). Put plainly, without the option of coercive relief later, declaratory relief is unavailable now.

\* \* \*

Make no mistake about what has really happened here. By discarding centuries of settled practice and precedent that kept true to the genius of the Constitution and its separation of powers, the majority has only confirmed one of the Founders' worst fears: that, while no man may be above the law, a group of judges, so emboldened, may consider themselves beyond it. See, *e.g.*, The Federalist No. 47, at 251-52 (Madison) ("[W]ere the

power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator*. Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor*.") (internal quotation marks omitted); The Federalist No. 78, at 407 (Hamilton) (observing that the loss of judicial legitimacy corrodes the rule of law, "sap[ping] the foundations of public and private confidence, and . . . introduc[ing] in its stead universal distrust and distress").

## II.

## A.

Just how far the judiciary has set itself above the law becomes ever more clear. The Emoluments Clauses are prime examples of the sort of constitutional provisions that are not self-executing and that judges may not enforce on their own. The text, structure, and history of the Constitution make plain that it is Congress and the people, not the federal courts, that are best positioned to address a President's alleged violations of the Clauses— whatever they may be said to mean. But in the majority's concluding ode to judicial supremacy, no mention of Congress is even to be found.

To begin with, the very fact that a clause is included in the Constitution does not automatically render it amenable to judicial enforcement. The Supreme Court has held that there are numerous structural provisions embedded in the Constitution that are beyond the immediate ambit of our jurisdiction. In fact, the Court has said as much with respect to *every* constitutional provision that resembles the Emoluments Clauses.

50

Consider, for starters, the cases of *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974), and *Ex Parte Levitt*, 302 U.S. 633 (1937), which concerned the Incompatibility and Ineligibility Clauses, respectively. The Incompatibility Clause provides that "no Person holding any Office under the United States, shall be a Member of either House [of Congress] during his Continuance in Office," U.S. Const. Art. 1, § 6, cl. 2, while the Ineligibility Clause says that "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time," *id*. In *Schlesinger*, opponents of the Vietnam War challenged the eligibility of certain members of Congress to simultaneously hold positions in the armed forces reserve. 418 U.S. at 210-11. They argued that unless those breaches of the Incompatibility Clause were remedied, they would "suffer[] injury because Members of Congress holding a Reserve position in the Executive Branch were . . . subject to the possibility of undue influence by the Executive Branch." *Id.* at 212. In *Ex Parte Levitt*, plaintiffs alleged that Hugo Black was appointed to the Supreme Court in violation of the Ineligibility Clause because he was named to a vacancy whose "Emoluments" (there, a pension plan) had increased and also arose while he was in the Senate. 302 U.S. at 633-34.

The Supreme Court rejected both claims. It held that plaintiffs' purported injury in *Schlesinger* was no more than a "generalized interest" in ensuring that elected officials comply with the terms of the Constitution. 418 U.S. at 227. Though the Court acknowledged that "[a]ll citizens" share "an interest in the independence of each branch of

Government," which is protected by the Incompatibility Clause, it ultimately concluded that "[t]he proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries." *Id.* The same held true in *Levitt*, where the Court maintained that the plaintiffs' interest in the Ineligibility Clause was "merely a general interest common to all members of the public," and thus non-justiciable. 302 U.S. at 634; see also *United States v. Richardson*, 418 U.S. 166, 176-80 (1974) (holding the same for the Receipts Clause).

Perhaps most relevant to the instant case is Chief Justice Marshall's discussion of the Title of Nobility Clause in *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821). That provision, contained in the same clause of Article I, Section 9 that includes the Foreign Emoluments Clause, states that "[n]o Title of Nobility shall be granted by the United States." In concluding that this provision would likely not be judicially enforceable, Chief Justice Marshall flatly stated that Article III "does not extend the judicial power to every violation of the constitution which may possibly take place." *Id.* at 405.

It takes no great imagination to see that the provisions at issue in the foregoing cases are all of a part with the Emoluments Clauses. They are all structural prohibitions designed to ensure that federal officials avoid the appearance of or opportunity for conflicts of interest. See Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341, 358-62 (2009) (characterizing the Foreign Emoluments, Ineligibility, Incompatibility, and Receipts Clauses as having the same animating purpose and being directed at "fears of corruption"). By their terms, these Clauses do not create any individual rights or protect against any direct harms. And, as one leading scholar has recognized, the Emoluments

Clauses also have "no means of enforcement within" them, Zephyr Teachout, *Gifts, Offices, and Corruption*, 107 N.W. U. L. Rev. Colloquy 30, 38 (2012), much like the other structural anti-corruption provisions the Supreme Court has found not to be judicially enforceable.

In fact, everything we know about the structure and design of the Constitution would make it seem that the Emoluments Clauses are *especially* inapposite for freestanding judicial resolution. Only the President must comply with both Clauses. But in numerous and diverse contexts, the Supreme Court has displayed extreme reluctance, based on the structure of the Constitution, to permit suits against the President. See, *e.g.*, *Clinton v. Jones*, 520 U.S. 681 (1997); *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *Nixon v. Fitzgerald*, 457 U.S. 731 (1982); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867). It is, at the very least, inconsistent with these opinions to suddenly discover that all along the Constitution has contained, in the Emoluments Clauses of all places, a ready-made equitable cause of action directly against the President in his official capacity. See *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part and concurring in the judgment) (noting that "[i]f official-action suits against the President had been contemplated, surely they would have been placed within [the Supreme] Court's original jurisdiction"); see also *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

This is not to say that the Clauses are purely precatory. Far from it. As Edmund Randolph observed at the Virginia Ratifying Convention, by operation of the Clauses, the President "is restrained from receiving any present or emolument whatever," to the point that Randolph concluded that "[i]t is impossible to guard better against corruption." 3

Debates on the Federal Constitution 486 (J. Elliot 2d ed. 1836) (hereinafter Elliot's Debates).  But if plaintiffs, it is said, cannot run to judges to enforce the Clauses, how then could those Clauses ever guard against corruption?  The answer is a simple one, common in our constitutional scheme: the interests recognized and protected by the Clauses are to be vindicated in either the courts of Congress or the courts of public opinion.

To begin with Congress, it is clear that the legislative branch has ample tools at its disposal to remedy a perceived violation of the Emoluments Clauses.  For one, the Foreign Emoluments Clause itself provides a mechanism by which Congress can approve, or disapprove, the President's receipt of emoluments from foreign powers.  The provision itself forbids the President from receiving any foreign emolument without "the Consent of the Congress."  U.S. Const. Art. 1, § 9, cl. 8.  Congressional oversight pursuant to the Clause is thus "not a minor check"; rather, it "leads to a radical transparency and interrogation that could chill quiet transfers of wealth for affection."  Teachout, *Gifts, Offices, and Corruption*, 107 N.W. U. L. Rev. Colloquy at 36.

Congress may also impeach a President for his non-compliance with the Clauses.  As Alexander Hamilton observed, the proper subjects for impeachment "are those offenses which proceed from the misconduct of public men, or, in other words, from the abuse or violation of some public trust."  The Federalist No. 65, at 338 (Hamilton).  It is hard to think of a more apt description of an Emoluments Clause violation.  The Framers said as much.  Randolph recognized that if the President is "discovered" to have received forbidden emoluments, "he may be impeached."  3 Elliot's Debates 486; see also 1 Annals

54

of Cong. 661 (1789) (remarks of Rep. Stone) (identifying impeachment as Domestic Emoluments Clause remedy).

Further, Congress could pass a statute mandating disclosure of the President's financial records, which would better enable the people to cast an informed ballot at the next election. See *Federal Election Comm'n v. Akins*, 524 U.S. 11, 24-25 (1998) (recognizing that as to disclosure informational injury can satisfy standing); see also L. Brandeis, Other People's Money 62 (National Home Library Foundation ed. 1933) ("Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."). While the relationship between the legislative and executive is itself often hotly contested territory, the legislature is in a far better position to enumerate a definition of an "emolument," distinguish between valid and invalid receipts thereof, and develop a remedial or oversight scheme that could lay a proper legal groundwork for some judicial involvement. But in its haste to let this case go forward, the majority gives short shrift to these superior enforcement means—mechanisms that Congress has not shied away from using in the past. See, *e.g.*, Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (2012).

Moreover, while Congress should be the leading branch of government to enforce the Emoluments Clauses, it is not the only check on the Executive. On the contrary, "that the Constitution does not afford a judicial remedy does not . . . impair [plaintiffs'] right to assert [their] views in the political forum or at the polls." *Richardson*, 418 U.S. at 179. As Chief Justice Marshall observed in *Marbury v. Madison*, the Constitution imposes certain duties on the President, in the performance of which "he is to use his own discretion, and

55

is accountable only to his country in his political character, and to his own conscience." 5 U.S. (1 Cranch.) 137, 166 (1803). Compliance with the Clauses is such a duty. If Congress fails to impeach the President, he is ultimately accountable to the electorate, and can be "displaced at the end of four years." 3 Elliot's Debates 486 (Edmund Randolph).

Even if we had the power to let this case go forward, prudence and any sense of judicial modesty should stop us from doing so. When faced with such an unprecedented case based on such tenuous constitutional grounds, we would do well to heed the ancient admonition against wanton abuse of judicial authority: "O, it is excellent / To have a giant's strength; but it is tyrannous / To use it like a giant." W. Shakespeare, *Measure for Measure*, act 2, sc. 2, lines 107-09. Not incidentally, the Great Bard was referring to a judge. The Emoluments Clauses—like the Incompatibility, Ineligibility, and Title of Nobility Clauses—are exemplars of constitutional provisions that are not self-executing, and are instead best left to the political branches and the electorate. All told, it is never good for judges to go beyond their authority, but it is an unforced error of exceptional hubris to grab *this measure* of unrestrained power all for ourselves.

Plaintiffs imply however that by dismissing this suit we would allow the President to be above the law. To the contrary, applying long-recognized principles of law to litigants raises no one above it. It is the majority's failure to apply them that lifts the courts alone above the law. It is not too much to ask that the judiciary think introspectively and survey the damage that the esteemed guardians of law inflict when they proceed to disregard it.

By not dismissing this case promptly, we have set in motion—without guidance from Congress, precedent, or tradition—a dangerous project involving the Emoluments

56

Clauses.   In so doing, we have returned to the worst era of equity, where judges were "at sea, and floated upon the occasional opinion which the judge who happened to preside might entertain of conscience in every particular case." 3 Blackstone 441.

### B.

No one of course takes corruption in public life lightly.  But that does not begin to answer the question about whether the corrective for such will ultimately be as bad or worse than the disease, and further, whether corruption can be used, or rather misused, as a pretext for the augmentation of judicial authority.  Why this most complex and politically-sensitive matter should be given to the institution least suited for resolving it is quite beyond me.  This presents serious problems, the least of which is that crafting from whole cloth an enforcement scheme for the Emoluments Clauses seems well beyond our competency.

Without the slightest courtesy of notice, which the legislative process would afford, we shall deign to inform the President what separates an acceptable from an unacceptable "emolument."  Of course, *this* President must be on the hook for having a passive financial stake in hotels administered by third parties that foreign and domestic sovereigns patronize in a commercial market.  Change the fact pattern one iota, though, and what is an acceptable emolument is anyone's guess.

Relatedly, we are not so much as amateur legislators, and I am entirely at a loss as to how we could fashion an injunction that would provide an effective and administrable remedy in this case.  And I am not alone; in fact, the *plaintiffs* repeatedly avoided telling the panel in this case what their ideal injunction would require of the President.  *In re Trump*, 928 F.3d 360, 376-77 (4th Cir. 2019).  At oral argument in this en banc appeal,

57

they finally floated the idea of an injunction that would require the President to *completely* divest his passive majority-stake in the Hotel.  Oral Argument at 1:07:15, *In re Donald J. Trump* (No. 18-2486).  But what this broad-stroke proposal has in candor it lacks in plausibility.  Divestment is traditionally quite disfavored at equity, namely because it often destroys the underlying business and also forces the owner, operating under court pressure, to sell-off at a discount or in a fire sale.  See *Boomer v. Atlantic Cement Co.*, 257 N.E.2d 870, 873 (N.Y. 1970).  This hardly counts as a realistic option, and the majority has not even attempted to suggest a sensible alternative.  These are all details to be filled in later after the case drags the presidency through the fishing expedition of discovery and the usual slew of insinuation.  But as I see it, the lack of an intuitive judicially-manageable remedy on the back end cautions against placing the judiciary, working entirely on its own, at the heart of an enforcement scheme in the first place.

Further, *even if* we could develop a coherent sense of rights and remedies under the Emoluments Clauses, problems still abound.  For example, with respect to the Foreign Emoluments Clause, it is quite hard to conceive of a potential judgment that would not at least partially infringe on the President's foreign affairs responsibilities.  The Supreme Court has termed the President "the sole organ of the federal government in the field of international relations," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), and "[w]ith respect to foreign affairs . . . the [Supreme] Court has recognized the President's independent authority and need to be free from interference," *Hamdi v. Rumsfeld*, 542 U.S. 507, 583 (2004) (Thomas, J., dissenting).  How to square even the most modest conception of the President's authority in foreign affairs with a scheme that would

58

have judges or their special masters oversee the propriety of every diplomatic gift or hotel tab remains a daunting task.

The only people I can think of who will fare better under this whole obscure regime are the lawyers who will dutifully assist those persons from the private sector who still dare to enter the public one. The majority's approach is an albatross for any businessperson, or any citizen for that matter, looking to be part of public service. Could a President stay in a pension plan that holds shares of Saudi Aramco? Could he send a child to a foreign university on a scholarship? Could he accept any tax credit on a property he owns abroad? Is the only sure way to comply with the Clauses to stuff one's pre-acquired assets in a mason jar and bury it in the backyard? The majority's decision will be one that launches a thousand questions. And while there might eventually be answers to them, I am positive that they will not come from the bench. I am also confident that the mere prospect of open-ended liability under the Emoluments Clauses will deter businesspeople, successful or not, from entering politics—an added toll at the gates of the political arena that this branch has no prerogative to impose.

All this said, there is a more fundamental problem still to what the majority has inaugurated. For the majority, the consuming indeterminacy that permeates this incipient Emoluments Clause jurisprudence is a *feature* of the system, not a bug. Indeed, from now on, every President will face an immediate and indeterminate specter of constitutional culpability under the Emoluments Clauses, the prospect of being hauled before a federal judge by a private or state litigant on the ground there has been some indirect disadvantage flowing from the receipt of some illicit "emolument." But nobody knows what any of this

59

means.  Without history, tradition, judicial precedent, or democratic input as our guide, these suits will inevitably turn on the unbound whim of the judiciary.  In other words, the federal courts, for purposes of the Emoluments Clauses, will be transformed into Oracles, to be beseeched by presidents and private litigants alike to learn whether an improper "emolument" has taken place.  What a windfall for judicial supremacy.  And, to boot, I do not think it farfetched to predict that, in these rank exercises of policymaking, federal judges will somehow line up on "party lines."

Can we not see the political cloak we are asked to don?  No federal court has ever allowed a party to sue the President under the Domestic Emoluments Clause.  Until this President.  No federal court has ever permitted the same with respect to the Foreign Emoluments Clause.  Until this President.  No federal court has used its powers in equity to remedy a standalone competitive harm, unsupported by positive law.  Until this President.  And no federal court has ever entertained the prospect of an injunction against a President in connection with the performance of his official duties.  Until this President. Following this barrage of doctrinal firsts, would it not be fair for our fellow Americans to suspect that something other than law was afoot?

The plaintiffs here are attempting nothing less than to enjoin the President of the United States for official actions taken while in office.  They are seeking to harness the coercive machinery of legal process to drag the President through what are coming to seem more and more like interminable proceedings.  To all of which the court responds: carry on!  The willingness of the majority to indulge this lawsuit is a missed opportunity to transcend the political moment.  Far beyond the context of today's political configuration,

the majority's grasp for judicial power at the expense of the elected branches of our government will stand as precedent that the judiciary can direct the actions of the Presidency to an extent inconceivable heretofore.

I respect of course the office of the presidency. But I revere, like each and every one of my fine colleagues on this court, the role of courts in making real the rule of law. But courts can best promote the rule of law by not setting themselves so self-evidently above it. The majority has jeopardized a great deal today. The trust the public holds in courts depends on our staying out of the political fray. As the one branch of government removed from the democratic process, the federal courts occupy a special position within our constitutional order. Namely, because we cannot be checked at the ballot box, and because we cherish our impartiality, we must scrupulously check the human tendency to excess in the exercise of power. To deserve our autonomy, we must, in the words of Justice Frankfurter, keep to a "duty of restraint, [a] humility of function." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 534 (1947). The majority, by prolonging and perpetuating an ad hoc and untethered Emoluments Clause claim, has failed many times over to keep to this command. In this most rancorous of times, we should burnish the ideal that we can be respected stewards of those powers with which we have, in an extraordinary exhibition of the Founders' and our fellow citizens' faith, been entrusted.

NIEMEYER, Circuit Judge, with whom Judges WILKINSON, AGEE, QUATTLEBAUM, and RUSHING join, dissenting:

The purpose for this unique action against the President of the United States is not revealed in any of the numerous filings by the District of Columbia and the State of Maryland, and the relief they seek — the President's divestiture of his interest in the Trump International Hotel in Washington, D.C. to prevent his receiving income from the Hotel — redresses no harm that has been caused to or threatened against them. Whether the Hotel's profits go to the President himself or instead to his family can make no conceivable difference to customers of the Hotel or to the District or Maryland. Had the plaintiffs actually suffered any discernable harm from the President's receipt of income from the Hotel, one might have expected that they would have described and complained of their harm before filing suit. But they never did so.

This question of purpose becomes yet more puzzling when taking into account that the District and Maryland's claims for relief are lodged in the Emoluments Clauses of the Constitution, which, by their terms, do not provide a cause of action or judicial remedy to anyone. Indeed, no court has ever enforced those Clauses against a President, despite the fact that prior Presidents have owned property while in office, producing income that could be attributed in part to domestic or foreign governments and officials. The District and Maryland's expansive interpretation of the Clauses would lead to the conclusion that no President could, for example, own municipal bonds in his investment portfolio or attend an embassy dinner funded by a foreign country.

At its core, this action does not present a case or controversy for which courts can provide redress. Rather, it appears simply to seek to use the courts to assert pressure against a political figure, placing unjustified stress on the separation of powers. Such pursuit of political aims should instead be resolved through the political process.

Yet, despite the unique nature of this action, the district court, through a series of fragmented rulings, has sought to avoid appellate scrutiny of its orders denying the President's motions to dismiss. And given the procedural history in this case, I can only conclude that the district court has purposefully endeavored to ensure that the President will continue to be subjected to this unprecedented litigation. The majority now protects this course, ruling that the President must, while in office, defend himself from this most marginal of lawsuits.

It is marginal in several respects. *First*, the plaintiffs bring their claims directly under the Constitution — without a statutory cause of action — seeking to enforce the Emoluments Clauses, which, by their terms, bestow no rights and provide no remedies. *Second*, the suit seeks an injunction directly against a sitting President, the Nation's chief executive officer. *Third*, up until the series of suits brought recently against this President under the Emoluments Clauses, no court in our Nation's history has ever entertained a claim to enforce them. *Fourth*, this and similar suits recently filed against the President under the Emoluments Clauses raise novel and difficult constitutional questions, for which there is no precedent. *Fifth*, the District and Maryland have failed to adequately articulate either how they are harmed by the President's alleged receipt of emoluments or how any harm so conceived could be redressed in court. In light of all this, allowing such a suit to

63

go forward in the district court without resolution of controlling issues by a court of appeals will result in an unnecessary intrusion into the duties and affairs of a sitting President. Indeed, the dire and far-reaching consequences of permitting a court to create and define a new right under a structural clause of the Constitution, as well articulated by Judge Wilkinson in his separate dissenting opinion, threaten to undermine the very structural foundation of the Constitution.

In circumstances far less remarkable and dramatic than those before us, the Supreme Court has authorized the issuance of a writ of mandamus to rectify either a judicial usurpation of power or a clear abuse of judicial discretion. As both are involved here, issuance of the writ is entirely appropriate. And when the action is scrutinized under the authority conferred by the writ, it becomes apparent *at the threshold* that the District and Maryland lack constitutional standing to bring the action.

Disregarding the compelling circumstances calling for mandamus relief, the majority opinion addresses the issues only with indisputable *general* propositions — glossing over the specific facts and procedural maneuvers of the district court — that do not take into account the particular circumstances. This approach hardly engages the issues presented.

As explained herein and in Judge Wilkinson's opinion, above, I submit that the District and Maryland's action must be dismissed. And as our court is unwilling to step in to do so, I can only hope and expect that the Supreme Court will do so under its well-established jurisprudence.

64

I

The District of Columbia and the State of Maryland commenced this action against Donald J. Trump in his official capacity as President of the United States, alleging that his continued interest in the Trump Organization — specifically in hotels and related properties — results in his receiving "emoluments" from various government entities and officials, both foreign and domestic, and that such receipts violate the Foreign and Domestic Emoluments Clauses of the U.S. Constitution.  They later amended their complaint to assert the same claims against the President in his individual capacity.

With regard to the Foreign Emoluments Clause, the complaint alleges that the President is benefiting and will continue to benefit from the business conducted by the Trump Organization with foreign governments and officials.  Focusing on the Trump International Hotel in Washington, D.C., in which the President has approximately a 76% interest, the complaint alleges that the Hotel markets itself to the diplomatic community and that, as a result, foreign officials have hosted events and "spent thousands of dollars on rooms, catering, and parking" at the Hotel.  In addition to benefits received from the Hotel, the complaint also alleges that the President has violated the Foreign Emoluments Clause by receiving income and benefits from foreign governments and officials through other sources, such as Trump Tower and Trump World Tower in New York City and the international distribution of the television show "The Apprentice" and its spinoffs.

With regard to the Domestic Emoluments Clause, the complaint again focuses predominantly on the Trump International Hotel and alleges that the Hotel, which leases the Old Post Office Building from the General Services Administration ("GSA"), a federal

agency, received a benefit from the GSA after the President's inauguration. While the Hotel's lease agreement provided that "[n]o . . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom," the GSA amended the lease agreement and issued a letter stating that the Hotel "is in full compliance with [the Lease] and, accordingly, the Lease is valid and in full force and effect." The complaint claims that this "forbearing from enforcing" the terms of the original lease agreement amounts to an "emolument" that violates the Domestic Emoluments Clause.

To support their standing to sue the President, the District and Maryland allege that they suffer "harm to their sovereign and/or quasi-sovereign interests," as well as "proprietary and other financial harms," because of the President's constitutional violations. Regarding sovereign interests in particular, Maryland alleges that it has a "sovereign interest in enforcing the terms on which it agreed to enter the Union," and the District and Maryland allege that each has an interest in enforcing its laws relating to property that the President or his business organizations own or might seek to acquire. More specifically, the complaint alleges that:

> The [President's] acceptance or receipt of presents and emoluments in violation of the Constitution presents the District and Maryland with an intolerable dilemma: either (1) grant the [Trump] Organization's requests for concessions, exemptions, waivers, variances, and the like and suffer the consequences, potentially including lost revenue and compromised enforcement of environmental protection, zoning, and land use regulations, or (2) deny such requests and be placed at a disadvantage vis-à-vis states and other government entities that have granted or will agree to such concessions.

66

In addition, the complaint alleges that the District and Maryland have a *parens patriae* interest in protecting their citizens from economic injury caused by the "payment of presents and emoluments to the [President's businesses]," asserting that such payments "tilt[ ] the competitive playing field toward his businesses, causing competing companies and their employees to lose business, wages, and tips."

Finally, with respect to their proprietary interests, the District alleges that it has a financial interest in the Walter E. Washington Convention Center, the D.C. Armory, and the Carnegie Library, and that its interests in those properties have been and continue to be harmed by the President's receipt of emoluments through the Trump International Hotel because such receipt allegedly gives the Hotel an unlawful competitive advantage. Maryland alleges similarly that it has a financial interest in the Montgomery County Conference Center in Bethesda and that the Center is suffering and will continue to suffer economic harm due to the competitive disadvantage resulting from the President's violations of the Emoluments Clauses.

For relief, the District and Maryland seek a declaratory judgment that the President is violating the Emoluments Clauses and an injunction prohibiting future violations. In particular, the District and Maryland have represented that an order directing the President to divest himself of his relevant business interests would be the most appropriate remedy for the violations they allege.

The President, in his official capacity, filed a motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), contending that the District and Maryland lack standing and that they failed to state a claim under the Emoluments Clauses.

He also filed a separate motion to dismiss in his individual capacity, alleging that he is absolutely immune from suit. The district court treated the issues raised by the President's motions in piecemeal fashion.

By an opinion and order dated March 28, 2018, the district court rejected the President's challenge to the District and Maryland's standing insofar as their claims were made in connection with the Trump International Hotel and its appurtenances in Washington, D.C. *See District of Columbia v. Trump*, 291 F. Supp. 3d 725, 732–33 (D. Md. 2018). The court found that the District and Maryland had "stated cognizable injuries to their quasi-sovereign, proprietary, and *parens patriae* interests," *id.* at 738, and concluded that such injuries were directly traceable to the President's alleged violations of the Emoluments Clauses, *id.* at 748–50. But the court granted the President's motion to the extent that the District and Maryland's claims were based on the operations of the Trump Organization *outside* the District of Columbia. *Id.* at 757–58.

Particularly as to the District and Maryland's alleged sovereign/quasi-sovereign interests, the district court noted that Trump Organization hotels had obtained "substantial tax concessions" from the District and from the State of Mississippi; that the GSA had amended the Hotel's lease agreement; and that the Governor of Maine had stayed at the Hotel during an official visit to Washington in the spring of 2017, suggesting that the District and Maryland "may very well feel themselves obliged, i.e., coerced, to patronize the Hotel in order to help them obtain federal favors." *Trump*, 291 F. Supp. 3d at 741–42.

As for the District and Maryland's proprietary interests, the court concluded that Maryland had sufficiently alleged injury based on competitive harm to the Montgomery

County Conference Center and that the District had sufficiently alleged injury based on competitive harm to the Washington Convention Center. *Trump*, 291 F. Supp. 3d at 744–45. The court stated that the District and Maryland had "alleged sufficient facts to show that the President's ownership interest in the Hotel has had and almost certainly will continue to have an unlawful effect on competition, allowing an inference of impending (if not already occurring) injury" to Maryland and the District's proprietary interests. *Id.* at 745.

And regarding the District and Maryland's *parens patriae* interests, the court concluded that both the District and Maryland "have sufficiently stated a concrete injury-in-fact to their *parens patriae* interests in protecting the economic welfare of their residents." *Trump*, 291 F. Supp. 3d at 748. Citing the large size of the hospitality industry within and bordering Washington, D.C., the court reasoned that "a large number of Maryland and District of Columbia residents are being affected and will continue to be affected when foreign and state governments choose to stay, host events, or dine at the Hotel rather than at comparable Maryland or District of Columbia establishments, in whole or in substantial part simply because of the President's association with it." *Id.*

In this March 28, 2018 opinion and order, the district court deferred ruling on the remaining issues raised by the President's motion filed in his official capacity. It also stated that it would "deal with the viability of the individual capacity claims [against the President] in a subsequent Opinion and Order," thus declining to address the President's assertion of absolute immunity. *Trump*, 291 F. Supp. 3d at 733 n.4.

69

On July 25, 2018, the district court issued another opinion and order, broadly defining the term emolument as "any profit, gain, or advantage" and holding that the various benefits alleged in the complaint to have been received by the President therefore qualified as "emoluments" under the Emoluments Clauses. *District of Columbia v. Trump*, 315 F. Supp. 3d 875, 894–95 (D. Md. 2018). In this opinion, the district court deferred ruling on the President's motion to dismiss the claims against him in his individual capacity based on absolute immunity and instead directed the parties to submit a discovery plan. *Id.* at 907.

On August 15, 2018, and again on December 3, 2018, the President requested, in filings submitted to the district court, that the court resolve the individual capacity motion to dismiss and rule on his assertion of absolute immunity at its earliest convenience, expressing concern that continued deferral would deny him the benefits of immunity, complicate discovery, and otherwise adversely affect him. Nonetheless, on December 3 — the very day the President had for the second time requested a ruling on the individual capacity motion to dismiss — the district court entered a discovery schedule contemplating six months of full fact discovery against the President in his official capacity.

In short, the district court denied the President's motion to dismiss the claims against him in his official capacity insofar as they pertained to the Trump International Hotel in Washington, D.C. And it repeatedly deferred ruling on the President's individual capacity claim of absolute immunity, instead ordering full discovery to proceed against the President in his official capacity.

70

The President filed a motion requesting that the district court certify its March 28 and July 15 orders under 28 U.S.C. § 1292(b) to authorize an interlocutory appeal. In particular, the President identified four issues as controlling legal questions warranting certification: "(1) [what is] the correct interpretation of the Emoluments Clauses; (2) whether Plaintiffs have asserted interests addressed by the Clauses and have an equitable cause of action under those Clauses; (3) whether Plaintiffs have Article III standing to pursue their claims; and (4) whether [the district court] has jurisdiction to issue the requested declaratory and injunctive relief against the President." But the court denied the motion to certify its orders for appeal, concluding that its orders did not satisfy the statute's criteria for certification — i.e., that an order involve a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from such order would materially advance the ultimate termination of the litigation. *District of Columbia v. Trump*, 344 F. Supp. 3d 828, 844 (D. Md. 2018). In so concluding, the court reiterated the reasoning of its earlier rulings. *See id.* at 835–43.

Following the district court's denial of his motion for § 1292(b) certification, the President, in his official capacity, filed a petition for a writ of mandamus in this court, seeking an order "directing the district court to certify its orders denying dismissal of [the] plaintiffs' complaint for immediate appellate review" or "directing the district court to dismiss [the] plaintiffs' complaint outright." He also requested a stay of the district court proceedings pending resolution of the petition.

By order dated December 20, 2018, we granted the President's request for a stay and scheduled the President's petition for oral argument, directing that the parties be

prepared to argue "not only the procedural issues regarding the mandamus petition but also the underlying issues of (1) whether the two Emoluments Clauses provide plaintiffs with a cause of action to seek injunctive relief and (2) whether the plaintiffs have alleged legally cognizable injuries sufficient to support standing to obtain relief against the President."

The three-judge panel that heard the case unanimously granted the President's petition for a writ of mandamus, directed the district court to certify its orders for immediate appeal, treated its orders as certified, and asserted appellate jurisdiction under § 1292(b). The panel then ordered that the case be dismissed for lack of constitutional standing. *See In re Trump*, 928 F.3d 360 (4th Cir. 2019). By order dated October 15, 2019, a majority of this court's judges voted to grant rehearing en banc, *see* 780 F. App'x 36 (4th Cir. Oct. 15, 2019), and oral argument proceeded before the en banc court on December 12, 2019.

II

With his petition for a writ of mandamus, the President requests that we direct the district court to certify its orders of March 28 and July 25, 2018, for interlocutory appeal under 28 U.S.C. § 1292(b), or, in the alternative, that we direct the district court to dismiss the District and Maryland's complaint outright.

The District and Maryland assert that § 1292(b) certification decisions are committed to the discretion of the district court and thus not reviewable through the extraordinary writ of mandamus. They note that the party seeking the writ must establish a clear and indisputable right to its issuance, which they maintain a party cannot do with respect to a district court's exercise of discretion.

72

The majority opinion rejects the assertion that § 1292(b) certification decisions are not reviewable through mandamus, acknowledging that "[i]f the district court ignored a request for [§ 1292(b)] certification, denied such a request based on nothing more than caprice, or made its decision in manifest bad faith, issuing the writ [of mandamus] might well be appropriate." *Ante* at 14. The majority concludes, however, that such a showing has not been made. In doing so, it fails to account for the relevant facts and proceedings.

In the circumstances of this case, I would grant the narrower of the President's requests, issuing the writ to direct the district court to certify its orders for immediate appeal. The facts and procedural history demonstrate that the district court's orders are paradigmatic orders for certification under § 1292(b) and that the district court clearly abused its discretion and usurped appellate jurisdiction in refusing to certify them. As such, this is an entirely appropriate case for mandamus relief directing § 1292(b) certification. I therefore find it unnecessary to reach the President's broader alternative argument that mandamus is also warranted to dismiss the suit outright, although there is certainly support for our authority to do so. *See, e.g.*, *In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 41 (2d Cir. 2014) (granting writ of mandamus based on a clearly erroneous finding of personal jurisdiction and directing the district court to dismiss all claims against a particular defendant); *In re Dale Chimenti*, 79 F.3d 534, 540 (6th Cir. 1996) (granting the writ and directing the district court to remand the entire case back to state court for lack of federal jurisdiction and observing that "[a]lthough the availability of permissive interlocutory appeal under § 1292(b) should normally militate against granting

73

the writ, it is plain that any attempt to obtain certification in this case would have been futile").

While § 1292(b) indisputably confers broad discretion upon district courts, *see Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995), the statute does not provide that a district court's exercise of discretion is unfettered and unreviewable. And the Supreme Court has repeatedly recognized that mandamus is appropriate in "exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (cleaned up); *see also Schlagenhauf v. Holder*, 379 U.S. 104, 110 (1964) ("The writ is appropriately issued . . . when there is usurpation of judicial power or a clear abuse of discretion" (cleaned up)); *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953) ("The supplementary review power conferred on the courts by Congress in the All Writs Act is meant to be used only in the exceptional case where there is clear abuse of discretion or usurpation of judicial power" (cleaned up)). This case presents exactly the exceptional circumstances contemplated by the Supreme Court. A holistic review of the district court's decisions, including its refusal to certify its orders for appeal under § 1292(b), reveals both a clear abuse of discretion — indeed amounting to whim and caprice — and a judicial usurpation of power in this most unusual case against the President of the United States, thus establishing his entitlement to the extraordinary remedy of mandamus.

74

A.  Writ of Mandamus

As one of the writs authorized by the All Writs Act, 28 U.S.C. § 1651(a), the writ of mandamus has traditionally been used "in aid of appellate jurisdiction . . . to confine the court against which mandamus is sought to a lawful exercise of its prescribed jurisdiction." *Cheney*, 542 U.S. at 380 (cleaned up).  And although the writ is "not [to] be used as a substitute for the regular appeals process," *id.* at 380–81, in limited circumstances, its use "extends to those cases which are within [a court's] appellate jurisdiction although no appeal has been perfected," *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25 (1943).  This is meant to ensure that "appellate jurisdiction [is not] defeated and the purpose of the statute authorizing the writ [is not] thwarted by unauthorized action of the district court obstructing the appeal." *Id.*

It is well established that the party seeking the writ of mandamus must demonstrate (1) that it has a "clear and indisputable" right to its issuance; (2) that there are "no other adequate means" to obtain the desired relief; and (3) that the writ is "appropriate under the circumstances." *Cheney*, 542 U.S. at 380–81.  And Supreme Court precedent indicates that these requirements are satisfied in the event of *either* a judicial usurpation of power *or* a clear abuse of discretion. *See id.* at 380; *Schlagenhauf*, 379 U.S. at 110; *Bankers Life*, 346 U.S. at 383.  Indeed, cases where the Supreme Court has granted the writ are varied and include those in which

> unwarranted judicial action threatened 'to embarrass the executive arm of the government in conducting foreign relations,' *Ex parte Republic of Peru*, 318 U.S. 578, 588 (1943), where [granting the writ] was the only means of forestalling intrusion by the federal judiciary on a delicate area of federal-state relations, *State of Maryland v. Soper*, 270 U.S. 9 (1926), where

75

> [granting the writ] was necessary to confine a lower court to the terms of an appellate tribunal's mandate, *United States v. United States Dist. Court*, 334 U.S. 258 (1948), and where a district judge displayed a persistent disregard of the Rules of Civil Procedure promulgated by [the Supreme] Court, *La Buy v. Howes Leather Co.*, 352 U.S. 249 (1957); *see McCullough v. Cosgrave*, 309 U.S. 634 (1940); *Los Angeles Brush Mfg. Corp. v. James*, 272 U.S. 701, 706, 707 (1927) (dictum).

*Will v. United States*, 389 U.S. 90, 95–96 (1967) (cleaned up). These cases reveal a particular sensitivity to matters that may jeopardize the proper allocation of power among the three branches of government and between the various levels of the federal courts — the very concerns implicated in the case before us. The weighty considerations presented here and the fact that all three criteria for mandamus are well met strongly counsel in favor of granting the writ to require certification under § 1292(b). *See Fernandez-Roque v. Smith*, 671 F.2d 426, 431–32 (11th Cir. 1982) (noting certain "separation of powers" issues at stake before directing the district court to both rule on a threshold jurisdictional issue *and* certify its order for interlocutory appeal under § 1292(b)).

To begin, the President has a clear and indisputable right to issuance of the writ for two independent reasons. The first reason is the district court's manifestly clear abuse of discretion in refusing to certify its orders for immediate appellate review under § 1292(b). As described in greater detail in Part II.B below, the district court's conclusion that the criteria for certification under § 1292(b) were not satisfied was simply divorced from law and reality. The second reason is the district court's usurpation of judicial power in attempting to insulate itself from appellate review, which is apparent from the pattern of actions taken by the district court to avoid creating an immediately appealable order.

76

A "clear and indisputable right" to mandamus relief based on the "usurpation of judicial power" arises when a district court acts outside its jurisdiction — for example, when there is an "action or omission on its part [that] has thwarted or tends to thwart appellate review of the ruling." *Roche*, 319 U.S. at 26. In such an instance, the writ is appropriately issued "to remove obstacles to appeal" rather than as a mere substitute for appeal. *Cf. id.* (holding that mandamus was not warranted where a trial court, in striking pleas in abatement, acted within its jurisdiction and in no way thwarted appellate review of its ruling). Such circumstances exist in this case. Even though each individual decision of the district court in this case purportedly fell within its jurisdictional purview, its several decisions, when viewed holistically, evince a purposeful intent by the court to insulate its rulings from appellate review. And the usurpation only continued when the district court acted beyond any judicial authority on the merits, as demonstrated by Judge Wilkinson in his accompanying opinion.

One of the ways in which the district court created obstacles to appeal relates to its treatment of the President's individual capacity claim of absolute immunity. Because the District and Maryland's claims against the President in both his official and individual capacities appear in one complaint filed in one case, any immediately appealable order with respect to the President in either capacity would grant this court jurisdiction to conduct appellate review. Yet, the district court's continued deferral of a ruling on the President's claim of absolute immunity — which would, if rejected, result in an immediately appealable order — shielded its decisions from any appellate review. *See Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) (explaining that orders denying claims of absolute

immunity are immediately appealable collateral orders).  This repeated deferral was particularly brazen in light of Supreme Court precedent that "immunity questions should be decided at the earliest possible stage of the litigation." *Clinton v. Jones*, 520 U.S. 681, 686 (1997); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Also, by declining to certify its orders under § 1292(b) when certification was clearly appropriate and instead declaring that its orders were "final and unreviewable," *Trump*, 344 F. Supp. 3d at 833, the district court also avoided appellate review of the unique issues that lie at the heart of this litigation.

Through its treatment of both absolute immunity and denial of § 1292(b) certification, the district court contrived to retain the litigation at the district court level and then ordered full fact discovery, despite the President's objection and representations that proceeding while his absolute immunity claim remained unresolved would "complicate discovery" and "ultimately lead to an inefficient allocation of party and judicial resources." These actions by the district court are all the more troubling against the backdrop of clear pronouncements from the Supreme Court that "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton*, 520 U.S. at 707; *see also id.* at 709 (assuming that, in litigation involving the President, district courts would be faithful "to the tradition . . . of giving the utmost deference to Presidential responsibilities" (cleaned up)).

78

In endeavoring to prevent an appealable order from materializing in this case, the district court inappropriately aggrandized its own jurisdiction and thereby abused judicial power. This alone was sufficient to afford the President the "clear and indisputable" right to the requested mandamus relief, particularly as the Supreme Court has "not limited the use of mandamus by an unduly narrow and technical understanding of what constitutes a matter of 'jurisdiction.'" *Kerr v. U.S. Dist. Ct. for N. Dist. Cal.*, 426 U.S. 394, 402 (1976); *see also Mallard v. U.S. Dist. Ct. for S. Dist. Iowa*, 490 U.S. 296, 309 (1989) (reversing the denial of a writ of mandamus where "the District Court plainly acted beyond its 'jurisdiction' as [Supreme Court] decisions have interpreted that term"). Confining district courts within the lawful limits of their jurisdiction and preventing "unauthorized action[s] . . . obstructing the appeal" lie at the core of the historical purposes underlying the mandamus remedy. *Roche*, 319 U.S. at 25; 16 Charles Alan Wright & Arthur R. Miller, *Federal Practice And Proce*dure § 3932 (3d ed. 2019) ("The most common traditional statement is that the extraordinary writs are available to a court of appeals to prevent a district court from acting beyond its jurisdiction, *or to compel it to take action that it lacks power to withhold*" (emphasis added)).

The right to mandamus relief is even more clear and indisputable when a petition for a writ of mandamus contains "a substantial allegation of usurpation of power" with respect to "an issue of first impression." *Schlagenhauf*, 379 U.S. at 111. Here, not only did the President's petition for mandamus allege the district court's usurpation of power, it correctly observed that the district court orders relied on "unprecedented legal theories," as more fully described in Judge Wilkinson's opinion. Indeed, when the district court

79

denied § 1292(b) certification, only one other federal court had ever considered the novel issues on which the President sought certification, and that court had come down the other way. *See Citizens for Responsibility & Ethics in Washington ("CREW") v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017).

It is thus readily apparent that the President has established the first requirement for a writ of mandamus. And the second two criteria easily follow in these unique circumstances. For one, the President has established that there are "no other adequate means" for him to obtain the desired relief. This prerequisite to mandamus relief "ensure[s] that the writ will not be used as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380–81. But the requirement is met where, as here, a district court has usurped judicial power to obstruct that very process. *See Roche*, 319 U.S. at 30–31. And while we ordinarily recognize that inconvenience to litigants in waiting until final judgment is not a sufficient basis for granting mandamus, that is no reason to refrain where there are "special circumstances which would justify the issuance of the writ." *Id.* The special circumstances here arise from the novelty of the issues raised and from the varied concerns implicated when the President is a litigant. As Chief Justice Marshall has observed, courts are not "required to proceed against the president as against an ordinary individual." *United States v. Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807) (No. 14,694).

Finally, it follows from the above that the last requirement for mandamus is also satisfied, as granting the writ in this case is "appropriate under the circumstances." When the district court insulated itself from appellate review through capricious application of the § 1292(b) criteria and unwarranted deferral of a ruling on absolute immunity, it left no

80

other mechanism for prompt appellate review of the threshold legal issues raised by the District and Maryland's complaint, which asserts unprecedented claims directly against a sitting President. *See Cheney*, 542 U.S. at 382 (recognizing the "paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties").

## B.  Section 1292(b) Certification

Focusing in particular on the denial of § 1292(b) certification, I conclude that the district court clearly abused its discretion and that such abuse is another reason underscoring the President's "clear and indisputable" right to mandamus relief. *See In re Trump*, 781 F. App'x 1 (D.C. Cir. July 19, 2019) (per curiam) (holding that a district court in similar circumstances abused its discretion in refusing § 1292(b) certification).

Section 1292(b) provides a limited exception to the general principle that the courts of appeals may review only final orders of the district courts. *See* 28 U.S.C. § 1291. Section 1292(b) states, in relevant part:

> When a district judge . . . shall be of the opinion that such order involves [1] a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.  The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order.

*Id.* § 1292(b).  The statute thus confers initial discretion on the district court to determine whether its order meets the three criteria for certification.  But once the court concludes that those criteria have been satisfied, its duty to certify becomes mandatory — the district

81

judge "*shall* so state in writing in such order" — and discretion is then vested in the court of appeals to determine whether to "permit an appeal to be taken from such order." *Id.* (emphasis added).

The District and Maryland argue that this "dual gatekeeper system" forecloses an appellate court's exercising its discretion when a district court has declined to certify an order for appeal. As a general proposition and for most cases, I agree. Disturbing an exercise of the discretion conferred on district courts to determine whether to certify orders for interlocutory appeal should be rare and occur only when a clear abuse of discretion is demonstrated or when that action usurps judicial power. This is so because § 1292(b), while mandating certification when the statutory criteria are met, nonetheless places broad discretion in the district courts to determine whether the criteria are satisfied. The statute confers discretion on courts of appeals as a separate and distinct aspect of its operation, providing that "[t]he Court of Appeals . . . may thereupon [after the district court's certification], *in its discretion*, permit an appeal to be taken from such order." 28 U.S.C. § 1292(b) (emphasis added). Section 1292(b) thus creates a two-step process in which the district court and the court of appeals exercise their discretion sequentially and independently.

But this does not mean that the district court's discretion in refusing to certify is unfettered and unreviewable, and the statute does not so provide. *See In re McClelland Eng'rs, Inc.*, 742 F.2d 837, 837, 839 (5th Cir. 1984) (concluding that "the [district] court's refusal to certify [under § 1292(b)] in the circumstances constitute[ed] an abuse of discretion," vacating the order denying § 1292(b) certification, and sending the case back

82

with a "request that the district court certify its interlocutory order for appeal") *overruled on other grounds by In re Air Crash Disaster Near New Orleans, La. on July 9, 1982*, 821 F.2d 1147 (5th Cir. 1987), *which was vacated by Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989) (mem.); *see also Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (recognizing that "[i]f a district court refuses certification . . . then a party may petition for a writ of mandamus" (cleaned up)); *Fernandez-Roque*, 671 F.2d at 431–32 (issuing a writ of mandamus directing the district court to rule on whether it had subject matter jurisdiction and then certify that ruling for interlocutory appeal under § 1292(b), concluding that the case "present[ed] the truly 'rare' situation in which it [was] appropriate for [the appellate court] to require certification of a controlling issue of national significance").

Such review, however, should be limited to circumstances where a district court's discretion is not "guided by sound legal principles" but by "whim," such that the court of appeals can conclude that the district court's actions amounted to a clear abuse of that discretion. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1931–32 (2016) (cleaned up) (addressing generally the nature of "discretion"). Moreover, when a district court determines that the statutory criteria are present, it has a "*duty* . . . to allow an immediate appeal to be taken." *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000) (emphasis added); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110–11 (2009). The district court cannot circumvent this duty by exercising its discretion to analyze the criteria in a manner unmoored from the governing legal principles, especially

83

when its underlying order "involves a new legal question or is of special consequence," *Mohawk*, 558 U.S. at 111.

Because it is readily apparent in this case that the district court's underlying orders clearly met the three criteria for certification under § 1292(b), the court's contrary determination was not "guided by sound legal principles" and thus amounted to a clear abuse of discretion. Indeed, its reasoning was completely divorced from governing law and factual reality.

*First*, the four issues on which the President sought certification — how to define "emoluments"; whether the District and Maryland have an implied equitable cause of action directly under the Emoluments Clauses; whether the District and Maryland have standing; and whether the district court could grant their requested relief against the President — amount to controlling questions of law. Certainly, each presents a "pure question of law, i.e., an abstract legal issue that the court of appeals can decide quickly and cleanly" without the need "to delve beyond the surface of the record in order to determine the facts." *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340–41 (4th Cir. 2017) (cleaned up). And these legal questions involve novel threshold matters that go to the heart of whether the case may proceed at all. They are thus "controlling." *See Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991) (noting that "controlling" in § 1292(b) "means serious to the conduct of the litigation, either practically or legally" (citation omitted)).

*Second*, there can be no dispute that there was substantial ground for difference of opinion with respect to the resolution of these controlling legal questions. As the President

84

noted, the district court was "the first ever to permit a party to pursue relief under the Emoluments Clauses for alleged competitive injury — or for any injury for that matter," and therefore the relevant questions are far from settled. The district court dismissed this novelty by reciting the general proposition that "numerous cases have found that a firm has constitutional standing to challenge a competitor's entry into the market," but it provided no authority applying that proposition to a direct claim under the Constitution, let alone a direct claim under the Emoluments Clauses. *Trump*, 344 F. Supp. 3d at 841 (cleaned up). In doing so, the court failed to engage the reality that, among other things, no previous court had enforced the Emoluments Clauses; that no decision had defined what "emoluments" are; that no prior decision had determined that a party can sue directly under the Emoluments Clauses when the constitutional provisions, by their terms, bestow no rights and specify no remedies; and that no case had held that a State has standing to sue the President for alleged injury to its proprietary or sovereign interests from a violation of the Emoluments Clauses. One can hardly question that the case is replete with "new legal question[s]" of "special consequence." *Mohawk*, 558 U.S. at 111.

Indeed, at the time of the district court's decision denying § 1292(b) certification, the Southern District of New York was the only other court to have considered a cause of action under the Emoluments Clauses, and that court ruled differently than did the district court here. *See CREW*, 276 F. Supp. 3d at 188. Yet, the district court dismissed the incongruity between its reasoning and the reasoning in *CREW* out of hand, characterizing the New York court's reasoning as "pure dicta" and asserting without further explanation that the "President's reliance on the *CREW* decision reflects — at best — an instance of

85

judges applying the law differently. It does not demonstrate, as is required for interlocutory appeal, that courts themselves disagree as to what the law is." *Trump*, 344 F. Supp. 3d at 838–39 (cleaned up).

The New York district court's decision in *CREW*, however, was not merely an instance of a court applying the same settled law to a different set of facts. There, as here, the plaintiffs were owners of establishments that catered to foreign and domestic government clientele and allegedly competed with the President's establishments. The New York plaintiffs asserted a theory of harm under the Emoluments Clauses that is nearly identical to the theory asserted by the District and Maryland in this case, even referencing many of the same factual examples of foreign diplomats patronizing the President's hotels. *See CREW,* 276 F. Supp. 3d at 182. It thus blinks reality to suggest that opinion in *CREW* — which addressed the issue of competitor standing and the type of harms encompassed by the Emoluments Clauses on nearly identical facts — did not signify the existence of a substantial difference of opinion on these issues. Moreover, even though the district court's opinion in *CREW* has since been vacated, the resulting Second Circuit decision and dissent likewise illustrate that there remain substantial grounds for difference of opinion on these controlling legal questions. *See CREW v. Trump*, 939 F.3d 131 (2d Cir. 2019).

*Third* and finally, there can be no doubt that prompt appellate resolution of these threshold questions could "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see also McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004) ("[T]he text of § 1292(b) requires that resolution of a 'controlling question of law . . . may materially advance the ultimate termination of the litigation.' This is not a

86

difficult requirement to understand.  It means that resolution of a controlling legal question would serve to avoid a trial or otherwise substantially shorten the litigation" (citation omitted)).  A determination on the threshold justiciability issues raised by the President's request for § 1292(b) certification would either terminate the case outright or, at the very least, serve to focus the challenge, inform discovery, and thereby shorten the litigation.

Despite the clarity with which each § 1292(b) factor was met in this case, the district court nonetheless declined to certify its orders and declared that its decision to deny such certification was "final and *unreviewable*."  *Trump*, 344 F. Supp. 3d at 833 (emphasis added).  While there are surely varied circumstances in which a district court can justifiably be "of the opinion" that its order does not satisfy § 1292(b)'s certification criteria, this is not one of them.  As the D.C. Circuit recently recognized in a similar case under the Emoluments Clauses, when a district court's orders "squarely meet the criteria for certification under § 1292(b)," it is an abuse of discretion for a district court to refuse a request for certification.  *In re Trump*, 781 F. App'x at 2.

In sum, a district court's refusal to certify its orders for appellate review under § 1292(b) creates a "clear and indisputable" right to mandamus relief in circumstances where the denial amounts to a clear abuse of discretion or the usurpation of judicial power. In its effort to retain jurisdiction, the district court's conduct in this case constituted both. As such, mandamus is appropriate "in aid of . . . jurisdiction" lest "the purpose of the statute authorizing the writ [be] thwarted by unauthorized action of the district court obstructing the appeal." *Roche*, 319 U.S. at 25.

87

III

Alternatively, I conclude that we have appellate jurisdiction over at least the district court's effective denial of the President's motion to dismiss on the basis of absolute immunity, as demonstrated in my dissenting opinion filed today in *District of Columbia v. Trump*, No. 18-2488. And having appellate jurisdiction on that basis, I would remand this action to the district court to dismiss it on the ground that the District and Maryland lack constitutional standing to bring the action, as shown in Part V below.

IV

With respect to the President's motion to dismiss the official capacity claims, the President presented numerous arguments to the district court flowing from the complex question of "whether and when the President is subject to suit under the Emoluments Clauses." The Foreign Emoluments Clause provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S. Const. art. I, § 9, cl. 8. And the Domestic Emoluments Clause provides:

> The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

U.S. Const. art. II, § 1, cl. 7. Neither Clause expressly confers any rights on any person, nor does either Clause specify any remedy for a violation. Rather, they are structural provisions concerned with public corruption and undue influence. In particular, the

88

Foreign Emoluments Clause is concerned with preventing U.S. officials from being corrupted or unduly influenced by gifts or titles from foreign governments. *See* 2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., 1911) ("Mr. Pinkney urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence and moved to insert [the Foreign Emoluments Clause]"); 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, 465 (Jonathan Elliot ed., 2d ed. 1836) ("The [Foreign Emoluments Clause] restrains any person in office from accepting of any present or emolument, title or office, from any foreign prince or state. . . . This restriction is provided to prevent corruption"). And the Domestic Emoluments Clause is concerned with ensuring presidential independence and preventing improper influence by the States. *See The Federalist No. 73*, at 378–79 (Alexander Hamilton) (George W. Carey & James McClellan eds., 1990) ("Neither the Union nor any of its members will be at liberty to give, nor will he be at liberty to receive any other emolument, than that which may have been determined by the first act. He can of course have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution").

As the Clauses do not expressly confer any rights or provide any remedies, efforts to enforce them in courts were virtually nonexistent prior to President Trump's inauguration in 2017. In that year, however, three separate complaints were filed against the President alleging Emoluments Clauses violations, including the complaint filed in this case. *See* Complaint, *CREW v. Trump*, No. 1:17-cv-458 (S.D.N.Y. Jan. 23, 2017);

89

Complaint, *Blumenthal v. Trump*, No. 1:17-cv-1154 (D.D.C. June 14, 2017); Complaint, *District of Columbia v. Trump*, No. 8:17-cv-1596 (D. Md. June 12, 2017).

In view of the nature, purpose, and language of the Clauses, there are numerous issues that would have to be resolved before allowing the case against the President to go forward. Because the District and Maryland have no express cause of action, statutory or otherwise, they rely on the district court's "inherent authority to grant equitable relief," citing the Supreme Court's recognition that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The President acknowledges this authority in the abstract but points to the Supreme Court's instruction that "[t]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief . . . depend on traditional principles of equity jurisdiction." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999) (cleaned up). And he contends that the relief sought by the District and Maryland was not "traditionally accorded by courts of equity." *Id*. at 319. As the President notes, the typical case in which plaintiffs sue to enjoin unconstitutional conduct without a statutory cause of action involves the "anti-suit injunction," a traditional equitable cause of action that "permit[s] potential defendants in legal actions to raise in equity a defense available at law." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014). Because the District and Maryland's suit falls outside the scope of this kind of case, the President

90

contends that allowing the suit to proceed would in effect recognize an entirely new class of equitable action.

Beyond that threshold question lie issues relating to whether the District and Maryland have an interest sufficient to bring a suit under the Emoluments Clauses. Not only would they need to show that the alleged violation caused them harm, but they would also need to show that such harm fell within the zone of interests protected by the Clauses. *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); *see also Wyoming v. Oklahoma*, 502 U.S. 437, 469 (1992) (Scalia, J., dissenting) (citing *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987)). The President maintains that the interests asserted by the District and Maryland are "so marginally related to the Emoluments Clauses' zone of interests" that they do not "remotely establish the type of private right needed" to make such a showing.

For relief, moreover, the District and Maryland seek an injunction against the President himself, a form of relief that the Supreme Court has termed "extraordinary" and has advised should "raise[ ] judicial eyebrows." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992). Indeed, as Judge Wilkinson notes, we generally lack the power to "sustain[] [an] injunction against the President in his official capacity." *Ante* at 39; *see also Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866) (making clear that "[a]n attempt on the part of the judicial department of the government to enforce the performance of" the President's duty "to see that the laws are faithfully executed" "might be justly characterized, in the language of Chief Justice Marshal[l], as 'an absurd and excessive extravagance'"); *Franklin*, 505 U.S. at 826–27 (Scalia, J., concurring in part and

91

concurring in the judgment) (noting that the Court is without authority to "require [the President] to exercise the 'executive Power' in a judicially prescribed fashion" or to "issue a declaratory judgment against the President" because "compell[ing] [him] personally to defend his executive actions before a court" would be "incompatible with his constitutional position").

In addition, as Judge Wilkinson also explains, "The text, structure, and history of the Constitution make plain that it is Congress and the people, not the federal courts, that are best positioned to address a President's alleged violation of the Clauses — whatever they may be said to mean." *Ante* at 50.

While all of these issues and more presented by the President to the district court do indeed raise an array of substantial questions about the viability of this action, the threshold matter that we must decide is whether the District and Maryland have standing under Article III to pursue their claims, a question that goes to our judicial power. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998).

V

The requirements for Article III standing are well established, and they apply in all cases regardless of the plaintiff or the particular theory of standing being asserted. As the Supreme Court has explained:

> In limiting the judicial power to "Cases" and "Controversies," Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law. Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action. This limitation is founded in concern about

the proper — and properly limited — role of the courts in a democratic society.

The doctrine of standing is one of several doctrines that reflect this fundamental limitation. It requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction. He bears the burden of showing that he has standing for each type of relief sought. To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury. This requirement assures that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009) (cleaned up). And, of course, an "assumption that if [the plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982) (cleaned up); *cf. United States v. Richardson*, 418 U.S. 166, 179 (1974) ("[T]he absence of" a proper "individual or class to litigate" supports the conclusion that "the subject matter is committed to . . . the political process").

In denying the President's motion to dismiss for lack of standing, the district court concluded that the District and Maryland sufficiently showed standing based on (1) the alleged harm to their proprietary interests in properties that were in competition with the Trump International Hotel in Washington, D.C.; (2) the alleged harm to their *parens patriae* interests on behalf of their residents' competitive interests that were similarly harmed; and (3) the alleged harm to their quasi-sovereign interests in not facing pressure

93

to grant the President's businesses favorable treatment. The District and Maryland rely on these theories on appeal, and I address each in turn.

A

The district court held that the District and Maryland have standing based on harm to the District's proprietary interest in the Washington Convention Center and Maryland's proprietary interest in the Montgomery County Conference Center, reasoning that the President's receipt of emoluments from the Trump International Hotel provides the Hotel with an illegal competitive advantage and thus diverts business away from these properties. *See Trump*, 291 F. Supp. 3d at 742–45. In so holding, the court accepted the District and Maryland's invocation of the "competitive standing doctrine," the "nub" of which is that "when a challenged . . . action authorizes allegedly illegal transactions that will almost surely cause [the plaintiff] to lose business, there is no need to wait for injury from specific transactions." *DEK Energy Co. v. FERC*, 248 F.3d 1192, 1195 (D.C. Cir. 2001) (cleaned up).

But even were the "competitive standing doctrine" to be accepted in this circuit, the doctrine is an *application* of Article III standing principles, not a *relaxation* of them. *See DEK Energy*, 248 F.3d at 1195. Thus, we must still determine whether the standard requirements for Article III standing are satisfied. And this requires assessing whether the District and Maryland have sufficiently pleaded that President Trump's conduct — i.e., his receipt of funds from foreign and state governments patronizing the Hotel — has caused harm to their proprietary interests and that enjoining that conduct would redress such harm.

94

*See Summers*, 555 U.S. at 492–93.  Upon conducting that assessment, I conclude that the District and Maryland's complaint fails to make the necessary showing.

To begin, the District and Maryland's theory of proprietary harm hinges on the conclusion that government customers are patronizing the Hotel *because the Hotel distributes profits or dividends to the President*, rather than due to a more general interest in currying favor with the President or because of the Hotel's branding or other characteristics.  Such a conclusion, however, is not only economically illogical, but it also requires speculation into the subjective motives of independent actors who are not before the court, thus precluding a finding of causation.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment"); *Bennett v. Spear*, 520 U.S. 154, 167 (1997) ("[T]he injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 28, 42–43, 45–46 (1976) (holding that indigent plaintiffs, who alleged that a regulation allowing favorable tax treatment to certain hospitals that provided only limited services to indigent patients "encouraged" those hospitals to deny them service, lacked standing to challenge the regulation, reasoning that it was "purely speculative whether the denials of service specified in the complaint fairly [could] be traced" to the regulation or "instead result[ed] from decisions made by the hospitals without regard to the tax implications" and that it was "equally speculative" whether the plaintiffs' desired injunction would result in them receiving service); *Linda R.S. v. Richard D.*, 410 U.S. 614, 615–19 (1973) (holding that a

95

mother lacked standing to seek an injunction to force the prosecution of her child's father for failing to pay child support, reasoning that because prosecution would result only in the father being jailed, it was overly "speculative" whether an injunction would result in future child support payments); *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (dismissing appeal for lack of Article III standing, reasoning that the plaintiff's theory of standing "depend[ed] on the independent actions of third parties, [thus] distinguishing its case from the 'garden variety competitor standing cases' which require a court to simply acknowledge a chain of causation 'firmly rooted in the basic law of economics'" (citation omitted)); *Am. Soc'y of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 149–50 (D.C. Cir. 1977) (concluding that plaintiffs' claim of competitive harm was "too speculative to support standing," reasoning that customers "might for a variety of reasons continue to prefer" competitors even if the plaintiffs prevailed). Indeed, there is a distinct possibility — which was completely ignored by the District and Maryland, as well as by the district court — that certain government officials might *avoid* patronizing the Hotel because of the President's association with it. *See United Transp. Union v. ICC*, 891 F.2d 908, 914 (D.C. Cir. 1989) (rejecting standing where it was "wholly speculative" whether the challenged conduct would "harm rather than help" the plaintiffs).

To be sure, the Second Circuit, in a split decision, did recently find that competitor standing existed in a parallel Emoluments Clauses case. *See CREW*, 939 F.3d at 142–48. But it was able to do so only by applying a generalized analysis of causation and traceability and attempting to distinguish the Supreme Court's decision in *Simon v. Eastern Kentucky Welfare Rights Organization*. Specifically, rather than analyzing how the New York

properties' distribution of income to the President gives those properties a competitive advantage over their competitors, the Second Circuit simply reiterated the causation standard at a highly general level and stated that there was "a substantial likelihood that [the plaintiffs'] injury [was] the consequence of the challenged conduct." 939 F.3d at 145. Taking language from the Supreme Court's decision in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville, Florida*, 508 U.S. 656, 666 (1993), out of context, it concluded that plaintiffs need only allege injury "caused by a defendant's unlawful conduct that skewed the market in another competitor's favor, notwithstanding other possible, even likely, causes for the benefit going to the plaintiff's competition." *CREW*, 939 F.3d at 146. But what the Second Circuit failed to explain is how a President's direct receipt of income from a hotel investment — as opposed to, for example, his family members' receipt of that income — could have skewed the market in his favor. Moreover, the Second Circuit strained unsuccessfully, I submit, to distinguish *Simon* — a precedent that should have foreclosed a finding that standing had been sufficiently alleged. *See CREW*, 939 F.3d at 169 (Walker, J., dissenting) (citing *Simon* to conclude that the plaintiffs' complaint failed to rise above speculation).

The inevitable conclusion in this case remains that there is no logical economic causation between the Trump Hotel's distribution of income to the President and harm to the Hotel's competitors. Significantly, the plaintiffs have failed to explain why the Hotel's allegedly unlawful competitive advantage would not continue at its same strength if, as is likely if divestiture were required, the Hotel's income were instead distributed to a member of the Trump family. The President's personal receipt of income from the Hotel surely

97

does not have a predictable effect on the decisions of third parties as to whether to patronize the Hotel nor a predictable effect of skewing the market in which the plaintiffs allegedly compete. *Cf. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (holding that plaintiffs had Article III standing where their "theory of standing . . . rel[ied] . . . on the predictable effect of Government action on the decisions of third parties"). As such, any causal link between the President's receipt of proceeds from his establishments and government officials' decisions on whether to patronize those establishments remains "unadorned speculation." *Simon*, 426 U.S. at 44.

Relatedly, it is unlikely that the relief the District and Maryland seek — a court order directing the President to divest himself of his interest in the Hotel — would cause government officials to cease spending money at the Hotel, which demonstrates a lack of redressability that independently bars a finding of standing. Even if government officials were patronizing the Hotel to curry the President's favor, there is no reason to conclude that they would stop doing so were the President to assign his interest in the Hotel to a family member. After all, the Hotel would still be publicly associated with the President and would still bear his name. Even after divestment, government officials could still well believe that continuing to patronize the Hotel would be an effective means of earning the President's favor. In short, the causal link between government officials' patronage of the Hotel and the Hotel's payment of profits or dividends to the President himself is simply too attenuated, and there is no indication that the District and Maryland's requested relief would redress their alleged injury.

98

At bottom, the District and Maryland are left to rest on the theory that so long as a plaintiff competes in the same market as a defendant and the defendant enjoys an unlawful advantage, the requirements for Article III standing are met. But such a "boundless theory of standing" has been expressly rejected by the Supreme Court:

> Taken to its logical conclusion, the theory seems to be that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful — whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on. We have never accepted such a boundless theory of standing. The cases [the plaintiff] cites for this remarkable proposition stand for no such thing. In each of those cases, standing was based on an injury more particularized and more concrete than the mere assertion that something unlawful benefited the plaintiff's competitor.

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013) (citing *Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 666 and *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115 (1974)).

Accordingly, I would reject the District and Maryland's argument that they have Article III standing based on harm to their proprietary interests.

### B

The district court also concluded that the District and Maryland have *parens patriae* standing to protect the economic interests of their citizens, accepting the argument that the District and Maryland's "residents are harmed by the President's alleged violations of both Emoluments Clauses because the competitive playing field is illegally tilted towards the President's Hotel." *Trump*, 291 F. Supp. 3d at 746. But, at bottom, the harm from which the District and Maryland are purportedly seeking to protect their citizens is exactly the

99

same type of harm that they allege with respect to their own proprietary interests. Their theory of *parens patriae* standing thus hinges on the same attenuated chain of inferences as does their theory of proprietary harm, and it accordingly suffers from the same defects.

While the District and Maryland rely on *Massachusetts v. EPA*, 549 U.S. 497 (2007), it provides them little help. In concluding that Massachusetts had standing to challenge an EPA decision, the Supreme Court relied on Massachusetts's own "particularized injury in its capacity as a landowner" and its "well-founded desire to preserve its sovereign territory," *id.* at 519, 522, as well as the procedural right and express cause of action provided by Congress, *id.* at 520. Neither factor is present here.

Thus, I would reject the District and Maryland's assertion of Article III standing based on their *parens patriae* interests.

C

Finally, the district court concluded that the District and Maryland have standing based on injury to their quasi-sovereign interests, *see Trump*, 291 F. Supp. 3d at 740–42, thus accepting the District and Maryland's argument that "their injury is the violation of their constitutionally protected interest in avoiding entirely pressure to compete with others for the President's favor by giving him money or other valuable dispensations" and that it is the "opportunity for favoritism" that disrupts the balance of power in the federal system and injures the District and Maryland.

In essence, the interest alleged to have been harmed in this manner amounts to no more than a general interest in having the law followed. And the Supreme Court has

100

"consistently held that a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992). Rather, to seek injunctive and declaratory relief, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized" and that "the threat [is] *actual and imminent, not conjectural or hypothetical*." *Summers*, 555 U.S. at 493 (emphasis added); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016); *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 586 (1972) ("It is axiomatic that the federal courts do not decide abstract questions posed by parties who lack a personal stake in the outcome of the controversy" (cleaned up)); *Beck v. McDonald*, 848 F.3d 262, 270–76 (4th Cir. 2017). The District and Maryland's assertion of injury to their quasi-sovereign interests fails to satisfy these requirements.

Indeed, this theory of standing is strikingly similar to the theory rejected in *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974). The plaintiffs in *Schlesinger* alleged that certain members of Congress were violating the Incompatibility Clause, which provides that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office," U.S. Const. art. I, § 6, cl. 2. To support Article III standing, the plaintiffs claimed that they "suffered injury because Members of Congress holding a . . . position in the Executive Branch were . . . subject to

101

the possibility of undue influence." *Schlesinger*, 418 U.S. at 212. The Court, with

reasoning that is strikingly applicable here, concluded that the plaintiffs lacked standing:

> [I]t is nothing more than a matter of speculation whether the claimed nonobservance of that Clause deprives citizens of the faithful discharge of the legislative duties of reservist Members of Congress. And that claimed nonobservance, standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury. . . .

*   *   *

> . . . [T]he District Court acknowledged that any injury resulting from the reservist status of Members of Congress was hypothetical, but stressed that the Incompatibility Clause was designed to prohibit such potential for injury. This rationale fails, however, to compensate for the respondents' failure to present a claim under that Clause which alleges concrete injury. The claims of respondents here . . . would require courts to deal with a difficult and sensitive issue of constitutional adjudication on the complaint of one who does not allege a personal stake in the outcome of the controversy. . . .

*   *   *

> Furthermore, to have reached the conclusion that respondents' interests as citizens were meant to be protected by the Incompatibility Clause because the primary purpose of the Clause was to insure independence of each of the branches of the Federal Government, similarly involved an appraisal of the merits before the issue of standing was resolved. All citizens, of course, share equally an interest in the independence of each branch of Government. In some fashion, every provision of the Constitution was meant to serve the interests of all. Such a generalized interest, however, is too abstract to constitute a 'case or controversy' appropriate for judicial resolution. The proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries.

> Closely linked to the idea that generalized citizen interest is a sufficient basis for standing was the District Court's observation that it was not irrelevant that if respondents could not obtain judicial review of petitioners' action, 'then as a practical matter no one can.' Our system of government leaves many crucial decisions to the political processes. The

102

> assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.

*Id.* at 217, 224, 226–27 (cleaned up); *see also Richardson*, 418 U.S. at 168–71 (holding that the plaintiff lacked standing to sue to enforce the Accounts Clause, U.S. Const. art. I, § 9, cl. 7, which provides that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time"); *Ex parte Levitt*, 302 U.S. 633 (1937) (per curiam) (holding that the plaintiff lacked standing to challenge Justice Black's appointment under the Ineligibility Clause, U.S. Const. art. I, § 6, cl. 2, which provides that "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time").

As in these cases, the District and Maryland's interest in constitutional governance is no more than a generalized grievance, insufficient to amount to a case or controversy within the meaning of Article III. *See Valley Forge Christian Coll.*, 454 U.S. at 482–87; *see also Schlesinger*, 418 U.S. at 222 ("To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction'").

VI

Accordingly, in the unique circumstances of this case, I would grant the President's petition for a writ of mandamus and direct the district court to certify its orders of March 28 and July 25, 2018, for interlocutory appeal. Moreover, rather than remanding the case to the district court simply to have it go through the ministerial task of certifying its orders, I would take the district court's orders as certified and grant permission to the President to appeal those orders, thus taking jurisdiction under § 1292(b). It is all but certain that the district court would certify its orders if we were to remand this case with instructions to do so, as confirmed by what recently occurred in one of the parallel emoluments cases. *See Blumenthal v. Trump*, No. 17-1154, 2019 WL 3948478, at *3 (D.D.C. Aug. 21, 2019) (certifying dismissal orders for immediate appeal under § 1292(b) upon a remand order from the D.C. Circuit stating that "the dismissal orders squarely met the criteria for certification" (cleaned up)).

Alternatively, as explained in my companion opinion in No. 18-2488, I would exercise appellate jurisdiction over the district court's effective denial of the President's claim of absolute immunity. *See Nixon*, 457 U.S. at 742 (noting that orders denying claims of absolute immunity are appealable collateral orders).

And on the issues raised, I would hold, as a threshold matter, that the District and Maryland lack Article III standing to pursue their claims against the President in either his official or individual capacity.

Therefore, I would reverse the district court's orders denying the President's motion to dismiss filed in his official capacity, and, consistent with my related opinion in No.

104

18-2488 addressing the President's motion to dismiss in his individual capacity, I would remand with instructions that the district court dismiss the District and Maryland's complaint in its entirety.